IN the INTEREST OF ANGELIA D.B., a Person Under the
Age of 18:

STATE of Wisconsin, Petitioner-Appellant,

v.

ANGELIA D.B., Respondent-Respondent.

Supreme Court

*No. 95–3104. Oral argument April 9, 1997.—Decided June 20,
1997.*

(Also reported in 564 N.W.2d 682.)

142

ABRAHAMSON, C.J., concurs.
BRADLEY, J., joins.

For the petitioner-appellant the cause was argued by *Gregory M. Posner-Weber, assistant attorney general* with whom on the briefs was *James E. Doyle*, attorney general.

For the respondent-respondent there was a brief and oral argument by *John D. Lubarsky*, state public defender.

¶ 1. JANINE P. GESKE, J. Angelia D.B. was charged with carrying a concealed weapon, contrary to Wis. Stat. §§ 48.12 and 941.23 (1993–94), after a school liaison police officer found a nine-inch knife hidden in her clothing. The Circuit Court for Winnebago County,

Judge Robert A. Haase, suppressed the knife and all derivative evidence obtained from Angelia D.B., because it concluded that the search violated her state and federal constitutional rights to be free from unreasonable searches and seizures. The state appealed these orders, and the court of appeals certified two questions for our review.

¶ 2. First, in determining the reasonableness of a search conducted in a public school by a police officer in conjunction with school authorities, is the proper Fourth Amendment standard the less stringent "reasonable grounds" standard set forth in *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), or the general standard of "probable cause"? Second, was the search conducted by the police school liaison officer in the instant case reasonable under the circumstances? We hold that the T.L.O. reasonable grounds standard applies to a search conducted on school grounds by a police officer at the request of, and in conjunction with, school authorities. Because the search of Angelia D.B. was reasonable under this standard to insure the safety of the students and school officials, we reverse the orders of the circuit court and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

¶ 3. On October 12, 1995, a Neenah High School student informed the assistant principal, David Rouse, that he had observed a knife in another student's backpack earlier that day. The informant also indicated that the other student might have access to a gun. Rouse called Officer Dan Dringoli, a City of Neenah police officer and school liaison officer on duty at Neenah High School at the time. After arriving at Rouse's office, Dringoli interviewed the informant, who repeated what he had observed and identified the other

student by her first name, Angelia. When Rouse checked the computer and determined Angelia's last name, the student said he believed her to be the person. Dringoli then went to Angelia D.B.'s classroom with Dean of Students Mark Duerwaechter, who entered the classroom and escorted Angelia D.B. to the hallway outside.

¶ 4. Dringoli identified himself and informed Angelia D.B. that they had received information that she may be carrying a knife or gun. While in the hallway, Dringoli conducted a brief pat down search of her jacket and pants and had Angelia D.B. search her backpack while he observed. No weapons were discovered. Angelia D.B. then accompanied Dringoli back to his office, where another police officer, Corporal Radtke, was present. Before returning to Dringoli's office, Duerwaechter searched Angelia D.B.'s locker as authorized by school policy, but did not discover any weapons.

¶ 5. After Angelia D.B. denied that she possessed any weapons, Dringoli informed her that he was going to check her further. Angelia D.B. first removed her jacket for Dringoli to search. When he did not find a weapon in her jacket, Dringoli lifted up the bottom of her shirt to reveal her waistband. Dringoli then observed two inches of a brown knife handle tucked in her waistband by her right hip. After Dringoli removed the nine-inch knife, which was locked in an open position, Dringoli informed Angelia D.B. that she was under arrest and advised her of her Miranda rights.

¶ 6. The State filed a juvenile delinquency petition charging Angelia D.B. with carrying a concealed weapon, contrary to Wis. Stat. §§ 48.12 and 941.23. Seeking to suppress the use of the knife as evidence, Angelia D.B. argued to the circuit court that Officer

Dringoli's search of her person, specifically his lifting of her shirt, was highly intrusive and required a showing of probable cause. Because the search was based solely on the informant's allegation without further corroboration, Angelia D.B. further asserted that Dringoli's search was not supported by probable cause. The circuit court granted Angelia D.B.'s motions to suppress the knife and all derivative evidence, ruling that the search of her person was unreasonable under all the circumstances.[1] The State appealed. The court of appeals certified this appeal for our review on July 17, 1996.

## STANDARD OF REVIEW

¶ 7. The reasonableness of a search is a constitutional question of law that this court reviews independently, benefiting from the analysis of the lower court. *Isiah B. v. State*, 176 Wis. 2d 639, 646, 500 N.W.2d 637, *cert. denied*, 114 S. Ct. 231 (1993). We will uphold the circuit court's findings of evidentiary and historical fact as they relate to whether the search was reasonable, unless they are against the great weight and clear preponderance of the evidence. *State v. Griffin*, 131 Wis. 2d 41, 62, 388 N.W.2d 535 (1986), *aff'd*, 483 U.S. 868 (1987).

---

[1] On November 6, 1995, the circuit court entered two orders to suppress evidence in this case. In the first order, the court suppressed the knife removed from Angelia D.B.'s person. In the second order, the court suppressed all derivative evidence following the removal of the knife from Angelia D.B.'s person, including but not limited to her statement on October 12, 1995. Both suppression orders were based on the circuit court's conclusion that the search and seizure of the knife were not reasonable under all of the circumstances.

¶ 8. Because the provisions of the Fourth Amendment and Article I, sec. 1 of the Wisconsin Constitution are substantially similar,[2] we conform the law of search and seizure under the Wisconsin Constitution to that developed by the United States Supreme Court under the Fourth Amendment to prevent the confusion caused by differing standards. *State v. Fry*, 131 Wis. 2d 153, 172–73, 388 N.W.2d 565, *cert. denied*, 479 U.S. 989 (1986).

## APPROPRIATE STANDARD OF REASONABLENESS

¶ 9. In this case, we are asked to determine the appropriate Fourth Amendment standard of reasonableness for a search of a student on school grounds by a police officer at the request of, and in conjunction with, school authorities. Specifically, the question is whether such a search is governed by the reasonable grounds standard set forth in *T.L.O.* or the general standard of probable cause.

---

[2] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, sec. 11 of the Wisconsin Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

147

¶ 10. The Fourth Amendment to the United States Constitution and Article I, sec. 11 of the Wisconsin Constitution proscribe unreasonable searches and seizures. As indicated by the text of these provisions, the constitutionality of a government search is measured by its reasonableness. *Vernonia School Dist. 47J v. Acton*, — U.S. —, 115 S. Ct. 2386, 2390 (1995). In measuring the reasonableness of a search, the search's "intrusion on the individual's Fourth Amendment interests" must be balanced "against its promotion of legitimate governmental interests." *Skinner v. Railway Labor Executive Assn.*, 489 U.S. 602, 619 (1989)(quoting *Delaware v. Prouse*, 440 U.S. 648, 654 (1979)). In most cases, a search is not considered reasonable unless it is conducted pursuant to a warrant issued upon a showing of probable cause. *Skinner*, 489 U.S. at 619. Nonetheless, "a warrant is not required to establish the reasonableness of all government searches; and when a warrant is not required . . ., probable cause is not invariably required either." *Acton*, 115 S. Ct. at 2390–91 (1995).

¶ 11. As the *T.L.O.* Court made clear, "[w]here a careful balancing of governmental interests and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause, [the Supreme Court has] not hesitated to adopt such a standard." 469 U.S. at 341; *see, e.g., Terry v. Ohio*, 392 U.S. 1, 30 (1968) (holding that at time of search and seizure on the street, officer had reasonable grounds to believe person was armed and dangerous); *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) (brief traffic stops by roving patrol in border area were subject to

reasonable suspicion standard); *United States v. Martinez-Fuerte*, 428 U.S. 543, 562 (1976) (routine stops at permanent check-points to check for smugglers and illegal aliens may be made without individualized suspicion); *Prouse*, 440 U.S. at 663 (discretionary spot checks by police must be based on at least articulable and reasonable suspicion that motorist is unlicensed or vehicle is unregistered).

¶ 12. We begin our analysis by reviewing the leading United States Supreme Court decision on individual searches of students in public schools. In *T.L.O.*, the Supreme Court evaluated the appropriate standard of reasonableness to apply to a search of a high school student's purse conducted by a school official. 469 U.S. at 331. After a teacher discovered the student smoking in the lavatory, in violation of a school rule, an assistant vice principal searched the student's purse for cigarettes. *Id.* at 328. The search revealed cigarettes, marijuana, and other evidence implicating the student in drug dealing. *Id.* The student moved to suppress the evidence found in her purse, arguing that the assistant principal's search violated the Fourth Amendment. *Id.* at 329.

■

¶ 13. The *T.L.O.* Court recognized that the Fourth Amendment's prohibition against unreasonable searches and seizures applied to searches conducted by public school officials as well as by police officers. The Court, however, dispensed with the warrant and probable cause requirements in the public school context when the search was conducted by school authorities. The Court maintained that to impose warrant requirements on school administrators " 'would unduly interfere with the maintenance of the swift and informal disciplinary procedures [that

are] needed,' and 'strict adherence to the requirement that searches be based on probable cause' would undercut the 'substantial need of teachers and administrators for freedom to maintain order in the schools.' " 469 U.S. at 340, 341 (citations omitted).

■

¶ 14. In addition, the Court emphasized that the state has a substantial interest in maintaining a safe and proper educational environment in its schools and, therefore, is permitted to exercise a degree of supervision and control that could not be exercised over free adults. "[A] proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult." *T.L.O.*, 469 U.S. at 339.

¶ 14a. The Court, however, acknowledged that schoolchildren do not lose all legitimate expectations of privacy once they enter onto school grounds. Specifically, the Court recognized that schoolchildren have a legitimate expectation of privacy in bringing various personal, noncontraband items to school such as school supplies, purses, keys, and necessary items for personal hygiene and grooming. *Id.* at 339.

■

¶ 15. Because the Fourth Amendment requires all searches and seizures to be reasonable, determining the standard of reasonableness to apply to a specific class of searches requires "balancing the need to search against the invasion which the search entails." *Id.* at 337 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 536–37 (1967)). In the school setting, the student's expectations of privacy, therefore, must be balanced against the interest of school officials in maintaining a safe and orderly learning environment. *Id.* at 339.

¶ 16. In balancing the student's legitimate expectation of privacy and the school's need to maintain a safe and proper educational environment, the Court concluded that teachers and school officials do not need a warrant or probable cause before searching a student who is under their authority. *Id.* at 340–41. "Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id.* at 341. To determine the reasonableness of a search of a student, the Court established the following twofold inquiry: first, the action must be "justified at its inception"; and second, the search, as actually conducted, must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 341 (quoting *Terry v. Ohio*, 392 U.S. at 20).

¶ 17. Applying this test, the *T.L.O.* Court held that the search of the student's purse was reasonable, given that a teacher had reported seeing the student smoking in the lavatory in violation of school rules and that the student denied doing so. *Id.* at 344–45. The Court, however, limited its holding to searches carried out by school authorities, noting that "[t]his case does not present the question of the appropriate standard for assessing the legality of searches conducted by school officials in conjunction with or at the behest of law enforcement agencies, and we express no opinion on that question." *Id.* at 341, n.7.

¶ 18. Because the Court in *T.L.O.* expressly reserved judgment on this question, lower courts since *T.L.O.* have applied different standards to searches conducted by law enforcement officials in conjunction with school officials, depending on the extent of police involvement. In situations where school officials initiate the search or police involvement is minimal, most

courts have held the reasonable grounds standard to apply. *See Cason v. Cook*, 810 F.2d 188, 191–92 (8th Cir. 1987) (applying the reasonable grounds standard where a school official acted in conjunction with a liaison officer in response to a report of stolen items); *People v. Alexander B.*, 270 Cal. Rptr. 342, 343–44 (Cal. Ct. App. 1990) (applying the reasonable grounds standard where a school official initiated an investigation and requested police to detain a group of students and search for a weapon); *J.A.R. v. State*, 689 So. 2d 1242, 1243 (Fla. Dist. Ct. App. 1997) (applying the reasonable grounds standard where a liaison officer conducted a search of a student after a school official had initiated the investigation).

¶ 19. The reasonable grounds standard has also been applied in cases involving school police or liaison officers acting on their own authority. *See In re S.F.*, 607 A.2d 793, 794 (Pa. Super. Ct. 1992) (applying the reasonable grounds standard to a search conducted by a plainclothes police officer for the school district); *People v. Dilworth*, 661 N.E.2d 310, 317 (Ill.), *cert. denied*, 116 S. Ct. 1692 (1996) (applying the reasonable grounds standard to a search conducted by a police liaison officer "conducting a search on his own initiative and authority"). *But see A.J.M. v. State*, 617 So. 2d 1137, 1138 (Fla. Dist. Ct. App. 1993) (holding that a school resource officer must have probable cause to conduct a search).

¶ 20. Notably, the probable cause standard is consistently applied where outside police officers initiate a search or where school officials act at the behest of law enforcement agencies. *See e.g., State v. Tywayne H.*, 933 P.2d 251, 254 (N.M. Ct. App. 1997) (applying the probable cause standard where two police officers providing security at a school dance conducted a search

152

on their own initiative with only minimal contact with school officials); *F.P. v. State*, 528 So. 2d 1253, 1254 (Fla. Dist. Ct. App. 1988) (applying the probable cause standard where an outside police officer investigating an auto theft initiated the search of a student at school).

¶ 21. Courts in some jurisdictions have analyzed *Acton* as well as *T.L.O.* to determine whether special needs exist to justify a departure from the usual Fourth Amendment standards of probable cause and a warrant within a public school context. *See e.g., People v. Dilworth*, 661 N.E.2d at 318 (applying both the *T.L.O.* and the *Acton* tests to determine the appropriate standard of reasonableness); *Tywayne H.*, 933 P.2d at 254–55 (1997) (applying both the *T.L.O.* and the *Acton* tests to determine whether a departure from the Fourth Amendment requirements of probable cause and a warrant was reasonable in police pat down of student); *State v. Barrett*, 683 So. 2d 331, 338 (La. Ct. App. 1996) (applying the *Acton* three-prong test to evaluate the reasonableness of a random drug search); *Picarella v. Terrizzi*, 893 F. Supp. 1292, 1301 (M.D. Pa. 1995) (applying the *Acton* three-prong test to evaluate the reasonableness of a search and seizure where school suspected student was victim of child abuse).

¶ 22. The *Acton* three-prong test balances the interests of the state against the expectation of privacy of the individual by examining these factors: (1) the nature of the privacy interest upon which the state's interest intrudes; (2) the character of the search; and (3) the nature and immediacy of the governmental concern at issue, and the efficacy of the means for meeting it. *Acton*, 115 S. Ct. at 2391–94. Although the tests set forth in both *T.L.O.* and *Acton* assessed whether the special needs of schools justified a departure from the

traditional Fourth Amendment requirements of probable cause and a warrant, the nature of the special needs considered in those cases were notably different. In *Acton*, the Court assessed the reasonableness of a district-wide drug testing program for student athletes in light of that district's serious problem with student drug use. In *T.L.O.*, however, the Court considered whether a search by school officials of an individual student suspected of violating established school rules was reasonable in light of the school's substantial interest in maintaining a proper educational environment. Because the facts of the instant case similarly concern an individualized search of a student on school grounds, we find the two-prong test set forth in *T.L.O.* to be more appropriate in this case.

¶ 23. Angelia D.B. argues, however, that the *T.L.O.* reasonable grounds standard should not apply to school searches conducted by police officers, regardless of the involvement of school officials. She bases her distinction on the adversarial relationship that exists between police officers and criminal suspects. Citing Justice Powell's concurring opinion in *T.L.O.*, Angelia D.B. maintains that the duties of police officers and school officials are inherently different.

> The special relationship between teacher and student also distinguishes the setting within which school children operate. Law enforcement officers function as adversaries of criminal suspects. These officers have the responsibility to investigate criminal activity, to locate and arrest those who violate our laws and facilitate the charging and bringing of such persons to trial. Rarely does this type of adversarial relationship exist between school authorities and pupils. Instead there is a commonality of interests between teachers and their pupils. The attitude

> of the typical teacher is one of personal responsibility for the student's welfare as well as for his education.

*T.L.O.*, 469 U.S. at 349 (Powell, J., concurring).

¶ 24. We agree that there are inherent differences between the roles of police officers and school officials which make the reasonable grounds standard inapplicable to searches conducted by police officers acting independently of school officials. A police investigation that includes the search of a public school student, when the search is initiated by police and conducted by police, usually lacks the "commonality of interests" existing between teachers and students. *See T.L.O.*, 469 U.S. at 349 (Powell, J. concurring). But when school officials, who are responsible for the welfare and education of all of the students within the campus, initiate an investigation and conduct it on school grounds in conjunction with police, the school has brought the police into the school-student relationship.

¶ 25. Angelia D.B. cites *Griffin*, 131 Wis. 2d 41, 56, as an example of our refusal to lower the probable cause standard for police searches, even though we permitted searches by another type of state official under a reasonable grounds standard. In *Griffin*, we held that a probation officer may conduct a warrantless search of a probationer's residence if the officer has reasonable grounds to believe that the probationer has contraband. *Id.* at 46. We declined to impose the probable cause standard in that situation, because we recognized that the nature of probation places limitations on the liberty and privacy rights of the probationer. *Id.* at 45. We refused to extend this exception to warrantless searches conducted by the police. *Id.* at 56.

¶ 26. Our reasoning in *Griffin*, however, does not require imposition of the probable cause standard here. In *Griffin*, we considered the nature of the relationship between probation officers and probationers. We concluded that the special needs of the probation system, to promote rehabilitation and to protect the public, permitted an exception to the warrant requirement for searches by probation agents. 131 Wis. 2d at 54–55. We also recognized that probationers' expectations of privacy were not the same as the expectations of persons not on probation. *Id.* at 55.

¶ 27. The *Griffin* rationale takes into account the same type of considerations as we do here, when we consider the constitutional standard for searches in public schools. We recognize the special needs of public school officials to maintain a safe environment, free of disruption and conducive to learning. Public school children have a lesser expectation of privacy at school. *T.L.O.*, 469 U.S. at 348 (Powell, J., concurring); *Acton*, 115 S. Ct. at 2392 (students' Fourth Amendment rights affected by "schools' custodial and tutelary responsibility for children").

¶ 28. Further, while we expressly declined to grant police the right to undertake a warrantless search in *Griffin*, it was the police who conveyed the original suspicion of weapons possession to the probation officer. Also in that case, police accompanied the probation officer to the probationer's apartment, where the search took place. In this case, in contrast, the investigation was initiated at the request of school officials. The investigation continued in conjunction with school officials. Further, Angelia D.B. was suspected of possessing a dangerous weapon within a public high school. Unlike a dangerous weapon located within a residence, a dangerous weapon within a school setting

poses a significant and imminent threat of danger to school staff and to the other students compelled to be there.

¶ 29. In Wisconsin, school attendance is compulsory, with certain exceptions, until age 18. *See* Wis. Stat. §§ 118.15, 115.82 (1995–96). School officials not only educate students who are compelled to attend school, but they have a responsibility to protect those students and their teachers from behavior that threatens their safety and the integrity of the learning process.[3] With the growing incidence of violence and dangerous weapons in schools, this task has become increasingly difficult. *See, e.g., Isiah B.,* 176 Wis. 2d at 650 (Bablitch, J., concurring) (providing statistics on the percentage of high school students carrying weapons); 18 U.S.C.A. § 922(q)(1)(F) (In 1994, Congress recognized that "the occurrence of violent crime in school zones has resulted in a decline in the quality of education in our country."). *See also,* U.S. DEPT. OF JUST., OFF. OF JUV. JUST. DELINQ. PREVENTION, *Juvenile Offenders and Victims: 1996 Update On Violence,* 7 (Feb. 1996) ("Almost half of high school students reported weapons in their schools in 1993.").[4]

---

[3] In California, for example, the state constitution provides that "All students and staff of public primary, elementary, junior high and senior high schools have the inalienable right to attend campuses which are safe, secure and peaceful." *See People v. Alexander B.,* 270 Cal. Rptr. 342, 344 (citing Article I, section 28, subd.(c), California Constitution).

[4] The presence of weapons in schools not only greatly increases the chances of serious injury, but fear of weapons among classmates significantly undermines the ability to attend and concentrate on classwork. *See U.S. v. Lopez,* — U.S. —, 115A S. Ct. 1624, 1663 (1995) (Breyer, J., dissenting) ("Congress expressly found in 1994 that 'parents may decline to send

As a result, many school officials have sought the assistance of school liaison officers in enforcing rules and maintaining order in public schools. *See* Jamaal Abdul-Alim, *In Oconomowoc Schools, Officer Is Liaison To Student Community*, Milwaukee Journal-Sentinel, Waukesha ed., June 10, 1997, at 2 (reporting that principal sees police/school liaison officer as a law enforcement resource for students and faculty alike; one liaison officer estimated that Wisconsin has 80 police/school liaison officers statewide).

¶ 30. That is the nature of the case before us. Officer Dringoli was on duty as a school liaison officer for Neenah High School. He became involved in this investigation only after school officials requested his assistance and, throughout the course of the investigation, he acted in conjunction with school officials on school grounds. Although the record is not clear as to Dringoli's specific duties, we may reasonably infer that where a law enforcement official has an office in the school, one of the official's responsibilities as a school liaison officer is to assist school officials in maintaining a safe and proper educational environment. Because the report of a knife on school premises posed an imminent threat of danger to students and teachers, it is

their children to school' in certain areas 'due to concern about violent crime and gun violence.' ") (citing 18 U.S.C.A. § 922(q)(1) (E) (Nov. 1994 Supp.)). In a statement before the Senate subcommittee on Juvenile Justice, 103d Cong., 1st Sess., 137 (1993), Willie L. Jude, Jr., Principal, James Madison High School, Milwaukee, Wisconsin, testified that during the 1992–93 school year, approximately one-half of the student expulsions from Milwaukee public schools were gun-related, and students between the ages of 13 and 16 accounted for more than 70% of the cases, *cited in* Sen. Bill Bradley, *Violence in America*, 10 St. John's J. Legal Comment 43, 49 n.12 (1994).

reasonable to conclude that Dringoli conducted the search of Angelia D.B. in conjunction with school officials and in furtherance of the school's objective to maintain a safe and proper educational environment.

¶ 31. Were we to conclude otherwise, our decision might serve to encourage teachers and school officials, who generally are untrained in proper pat down procedures or in neutralizing dangerous weapons, to conduct a search of a student suspected of carrying a dangerous weapon on school grounds without the assistance of a school liaison officer or other law enforcement official. While the *T.L.O.* Court adopted the less stringent reasonable grounds standard in part because of the need of teachers to "maintain swift and informal disciplinary procedures," 469 U.S. at 340, 341, it could be hazardous to discourage school officials from requesting the assistance of available trained police resources. Even in *Terry*, the Court recognized that it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. *Terry*, 362 U.S. at 23. *See also, Tywayne H.*, 933 P.2d at 255 (the nature and immediacy of the government's concern in ridding school grounds of weapons is of great importance). The proper standard for the constitutional reasonableness of searches conducted on public school grounds by school officials, or by police working at the request of and in conjunction with school officials, should not promote unreasonable risk-taking. *See, e.g., J.A.R. v. State*, 689 So. 2d at 1243 ("[t]he fact that the school official prudently asked a law enforcement officer to assist in this search does not increase the level of suspicion needed to perform a pat-down of a student to determine if he or she possesses a dangerous weapon.").

159

¶ 32. Teachers and school officials are trained to educate children and to provide a proper learning environment. Law enforcement officials, on the other hand, receive specialized training on how best to disarm individuals without subjecting themselves or others to danger. When faced with a potentially dangerous situation beyond their expertise and training, school officials must be allowed "a certain degree of flexibility" to seek the assistance of trained law enforcement officials without losing the protections afforded by the reasonable grounds standard. *See T.L.O.*, 469 U.S. at 340. We therefore find it permissible for school officials who have a reasonable suspicion that a student may be in possession of a dangerous weapon on school grounds to request the assistance of a school liaison officer or other law enforcement officials in conducting a further investigation.

¶ 33. Although *T.L.O.* did not address this question, we conclude that an application of the *T.L.O.* reasonable grounds standard, and not probable cause, to a search conducted by a school liaison officer at the request of and in conjunction with school officials of a student reasonably suspected of carrying a dangerous weapon on school grounds is consistent with both the special needs of public schools recognized in *T.L.O.* and with decisions by courts in other jurisdictions.

REASONABLENESS OF THE SEARCH

¶ 34. The case before us involved two separate searches conducted by Officer Dringoli. The initial search was a quick pat down of Angelia D.B.'s coat and pants. Due to the nature of the allegations by the eyewitness student-informant, Angelia D.B. concedes that this search was reasonable. At issue in this case, how-

ever, is whether the second search, a more thorough search of Angelia D.B.'s coat and person within Dringoli's office, was reasonable. Weighing the gravity of a knife within the school concealed on a student's person, and the state's substantial interest in maintaining a safe and proper educational environment against the student's legitimate expectation of privacy, we find the search here reasonable.

¶ 35. In reaching this conclusion, we apply the two-prong test of *T.L.O.* First, the search must be reasonable at its inception; and second, the search as actually conducted must be reasonably related in scope to the circumstances justifying the interference in the first instance. The Court further explained:

> [A] search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and are not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*Id.* at 341–42 (footnotes omitted).

¶ 36. In applying this test, Dringoli must have had reasonable grounds to suspect that Angelia D.B. possessed a knife in violation of the law or school rules for his search of her to be justified at its inception. Dringoli conducted the search of Angelia D.B. after being informed that a student had observed her in possession of a knife. *See State v. Michael G.*, 748 P.2d 17, 20 (N.M. Ct. App. 1987) (finding that a student who

witnesses a crime by another student and reports it to school officials is presumed to be reliable); *S.C. v. State*, 583 So. 2d 188, 192 (Miss. 1991) ("Absent information that a particular student informant may be untrustworthy, school officials may ordinarily accept at face value the information they supply."). Under these circumstances, Dringoli had reasonable grounds to suspect that Angelia D.B. possessed a knife. The search was justified at its inception.

¶ 37. Next, we consider whether the scope of the search was reasonable. "[A] search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and are not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.*, 469 U.S. at 342.

¶ 38. As part of the investigation of the student informant's allegations, Dringoli initially conducted a brief pat down search of Angelia D.B.'s pants and jacket in the hallway. The Dean of Students, Mark Duerwaechter was present. Dringoli then asked the student to search her own backpack. After these efforts disclosed no weapon, Dringoli requested that Angelia D.B. accompany him back to his office. Duerwaechter conducted a locker search, but found no weapon. Entering the office, Dringoli, in the presence of Corporal Radtke, informed Angelia D.B. that he was going to conduct a more thorough search. Dringoli first searched her coat and then lifted up the bottom of her shirt to expose her waistband. After Dringoli observed a knife tucked into Angelia D.B's waistband and then removed it from her person, the search stopped.

¶ 39. Throughout this investigation, Officer Dringoli was searching for a knife that a student reportedly observed in Angelia D.B.'s possession ear-

lier that day. Angelia D.B. does not allege, nor does the record indicate, that Dringoli was searching for anything but the knife that the informant claimed to be in her possession. Further, Dringoli limited his search only to areas where Angelia D.B. could reasonably conceal a weapon. We, therefore, find that the measures employed by Dringoli were reasonably related to the objective of determining whether Angelia D.B. had a knife in her possession on school grounds.

¶ 40. We also conclude that the search was not excessively intrusive in light of Angelia D.B's age and gender, and the nature of the infraction. Angelia D.B. is female and was almost sixteen years old at the time of the search. She was suspected of possessing a dangerous weapon within a public school. Because Dringoli lifted her shirt only high enough to observe Angelia D.B.'s waistline, this search was a relatively minor intrusion when compared to the nature of the infraction - possession of a dangerous weapon on school grounds.

¶ 41. Since we conclude that Dringoli's search was reasonable under the circumstances, we hold that the circuit court erred in suppressing the knife and all derivative evidence. Accordingly, the orders of the circuit court are reversed and the case is remanded to the circuit court for further proceedings.

*By the Court.*—The orders of the circuit court are reversed and cause remanded.

¶ 42. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE (*concurring*). I agree with the majority opinion that the search was constitutional and that the evidence should not be suppressed.

¶ 43. I write separately because I conclude, as the State argued, that the officer possessed probable cause (the highest standard required by law) to detain Angelia D.B and that the search incident to that detention was reasonable. A well-accepted constitutional ground exists to support this search. It is therefore unnecessary for resolution of this case for the court to reach out to adopt a new lower standard to support the search.[1]

¶ 44. The court should rarely if ever make a difficult and important constitutional determination in a case in which such a determination is unnecessary.[2] As a general rule, we should form constitutional rules only when, and only so far as, necessary to resolve actual controversies. In this case especially, when the facts support probable cause and the case law is sparse and inconsistent about standards other than probable cause, I think the court errs by reaching out and trying to formulate an all-encompassing rule.

¶ 45. For the reasons set forth, I write separately.

---

[1] *See State v. Richards*, 201 Wis. 2d 845, 866, 549 N.W.2d 218 (1996) (Abrahamson, J., concurring), *affirmed on other grounds* 117 S. Ct. 1416 (1997); *State v. Stevens*, 181 Wis. 2d 410, 441, 511 N.W.2d 591 (1993) (Abrahamson, J., concurring).

[2] In the following cases the court has stated, and followed, the rule that it will not reach a constitutional issue when the resolution of a controversy does not require it. *City of Franklin v. Crystal Ridge, Inc.*, 180 Wis. 2d 561, 573 n.8, 509 N.W.2d 730 (1994); *Ziegler Co., Inc. v. Rexnord, Inc.*, 139 Wis. 2d 593, 612–13, 407 N.W.2d 873 (1987); *S.B. v. Racine County*, 138 Wis. 2d 409, 412, 406 N.W.2d 408 (1987); *Labor & Farm Party v. Elections Bd.*, 117 Wis. 2d 351, 354, 344 N.W.2d 177 (1984); *Kollasch v. Adamany*, 104 Wis. 2d 552, 561, 313 N.W.2d 47 (1981).

¶ 46. I am authorized to state that Justice Ann Walsh Bradley joins this opinion.