**IN RE D.D.**

[146 N.C. App. 309 (2001)]

IN THE MATTER OF: D.D.

No. COA00-947

(Filed 2 October 2001)

**1. Search and Seizure— juvenile on school grounds—not a student—officer involvement—reasonableness**

The trial court properly denied a juvenile's motion to suppress in a proceeding based upon an allegation that she was in possession of a knife on school property where a substitute teacher relayed to the principal an overheard conversation that a group of girls were coming onto the campus at the end of the day for a fight; the principal and several officers found four girls in a parking lot where their presence was unusual; and an eventual search in the principal's office revealed the knife. In balancing the students' privacy interest against the principal's obligation to maintain both a safe and educational environment, the facts of this case weigh in favor of applying the standard of *New Jersey v. T.L.O.*, 469 U.S. 325, even though some of the students were not from that school. Moreover, the T.L.O. standard should apply when school officials bring police officers into the school setting because the officers are there to assist the school in creating and sustaining a safe environment conducive to learning. Given the totality of the evidence, the officers' involvement here was minimal relative to the actions of the principal.

**2. Juveniles— delinquency—possession of knife on school property—sufficiency of evidence**

There was sufficient evidence to support a juvenile's conviction for possessing a knife on school property where she contended that the parking lot where she first encountered the principal was not educational property because a city bus stop was located on the property, but the principal testified that the parking lot was school property. In reviewing a challenge to the sufficiency of evidence, the evidence must be viewed in the light most favorable to the State. N.C.G.S § 14-269.2(d).

Appeal by juvenile from judgment entered on 1 May 2000 by Judge Kenneth C. Titus in District Court, Durham County. Heard in the Court of Appeals 22 May 2001.

**IN RE D.D.**

[146 N.C. App. 309 (2001)]

*Attorney General Michael F. Easley, by Assistant Attorney General George K. Hurst, for the State.*

*UNC Clinical Programs, by Joseph E. Kennedy, for juvenile-appellant.*

TIMMONS-GOODSON, Judge.

D.D. ("juvenile") appeals from an order adjudicating her delinquent and placing her on a one-year period of supervised probation. For the reasons herein stated, we affirm juvenile's adjudication of delinquency.

On 15 February 2000, a petition was filed alleging that juvenile was delinquent, in that she "unlawfully, willfully did possess[] a knife on educational property, Hillside High School ("Hillside")" in violation of North Carolina General Statutes section 14-269.2(d). During 4 April 2000 adjudication hearing, juvenile moved to suppress the knife referenced in the petition. Pursuant to juvenile's motion, the trial court conducted a *voir dire* of Hillside's principal, Hermitage Hicks ("Principal Hicks"), and juvenile.

Principal Hicks testified that on 11 January 2000, a substitute teacher overheard a conversation among a group of students during in-school suspension and related the substance of that conversation to the principal. According to the substitute teacher, a group of girls was coming onto Hillside's campus to fight at the end of the school day. The substitute teacher further related to Principal Hicks the name of one Hillside student who the students noted would be involved in the fight.

In response to the teacher's comments, Principal Hicks "got with" Hillside's resource officer, Officer May, approximately ten minutes prior to the end of the school day and "made him aware of what the situation was." Officer May and Principal Hicks stationed themselves at opposite ends of the Hillside school building.

As Principal Hicks observed the front end of campus from his office, he noticed four female students in the parking lot. Principal Hicks testified that the females' presence in the lot was unusual for that time of the day, because students were not allowed in that parking lot without permission from an administrator. Principal Hicks recognized only one of the females as a Hillside student.

**IN RE D.D.**

[146 N.C. App. 309 (2001)]

Principal Hicks stated that the parking lot was property of Hillside and only senior students, faculty, and visitors were authorized to park in the lot. A city bus stopped in the parking lot and thus, non-students could board buses from the lot.

Principal Hicks "gathered" Officer May, and two other police officers, Officers Burwell and McDonald, and the four men walked to the parking lot. Principal Hicks referred to Officer May as the school resource officer. The principal referred to Officers Burwell and McDonald as off-duty officers and specifically stated that Officer Burwell was "employed in our school." Officer Burwell later testified at the adjudication hearing that he was the city police officer assigned to Hillside as a "security officer." Juvenile testified on *voir dire* that the officers were in uniform and were carrying guns.

By the time the principal and the officers reached the lot, Hillside students had been dismissed from their classes and were filtering into the parking lot. According to Principal Hicks, when he and the officers arrived in the lot, the officers "allowed" him to confront the students. Principal Hicks then inquired of the Hillside student what she was doing in the parking lot. The student told the principal that she "had had an appointment and that she had met these three girls that were with her up at the bus stop on Fayetteville Street and they had walked to school with her. But she was just coming to get her books out of her locker."

According to Principal Hicks, the Hillside student stated that she knew she was in an unauthorized area. As Principal Hicks confronted the Hillside student, the other three girls "became very talkative" and one of them became "profane and vulgar." According to Principal Hicks, the females had a "don't careish [sic] attitude," and he and the officers "had to listen to all this back talk." The principal further recalled that the students "were joking about not being in school." As the students "kept trying to walk away," the officers "were there to tell them to 'hold on.'" Principal Hicks testified that while he questioned the girls, other than telling the students to "hold on," he could not remember the officers speaking to the students, as "they are there to assist [school officials] and that we are in control of the school. So we should be the front person in that kind of thing."

Principal Hicks then began to ask the girls for their names. The principal used a cellular telephone to call the Durham Public Schools' central office and determined that the names given by the students were false. He then asked the three girls for the name of the school

IN RE D.D.

[146 N.C. App. 309 (2001)]

they attended. Principal Hicks testified that he called the school referenced by the three girls, and determined that they did not go to that particular school. Principal Hicks then testified that he called "the Learning Center," and confirmed that the girls attended "the Learning Center." Principal Hicks further attempted to contact the Learning Center's principal, but was unable to do so at that time. Principal Hicks testified that he was not going to let the girls leave because:

> Based on the information that I had within my mind and my frame of thought at that particular time, I knew of no school in our school system that would have dismissed and allowed students to have been on my campus at that time.

> And I feel an obligation when they are on my campus to call and try to see where they should be in school. . . . [I was not going to let them leave] '[t]ill I got some information as to where they attended school and why they were not in school.

In addition, Principal Hicks testified that he had "to make reports when [he found] students from another school on [his] campus like that." The principal likewise expressed concern that because he was aware that when students come on the school's campus to fight, "sometimes they bring things to use."

At some point during the encounter, Officer May requested permission from one of the female students, S.J., to search her purse. Principal Hicks testified that he did not remember specifically where the search of S.J.'s purse took place, either later in his office or in the parking lot. Juvenile subsequently testified on *voir dire* that the search of the purse occurred in the parking lot and that before S.J. could give Officer May her purse, the officer "grabbed" the purse from S. J.'s shoulder. Upon searching the purse, the officer discovered a box cutter.

The principal and the officers "took the four [girls] over to [his] office." Principal Hicks testified that from the time he and the officers first confronted the students until they left for the office, the students had moved a third of the way across the parking lot toward the street.

Upon arriving in his office, Principal Hicks contacted the principal of what he called the "Alternative School." As he was receiving the necessary information from the other school, Principal Hicks told the officers, "Since I have information that they were coming here to

**IN RE D.D.**

[146 N.C. App. 309 (2001)]

fight, then I think I have a reason to ask them what they have on their persons." The officers agreed, and Principal Hicks asked juvenile and the other girls to empty their pockets. Subsequent trial testimony revealed the juvenile had a knife in her pocket, which she placed on the principal's desk. Officer Burwell later testified at the adjudication hearing that he and Principal Hicks made the decision to charge juvenile.

Juvenile testified on *voir dire* that school had just let out of session when she and the other individuals entered campus. She further testified that prior to being approached by the principal and the three officers, she was leaving to go home via the city bus that stopped in the parking lot. According to juvenile, she and two of the other girls were enrolled at the "High School Learning Center" and that she had attended school that day. Juvenile testified that the female students who came onto the Hillside campus after school had been dismissed for the purpose of allowing the one Hillside student to retrieve her possessions. Juvenile stated that she remained in the parking lot because she missed the bus, and she and the other females were crossing the street to catch another bus. Juvenile further stated that when the group was approached by Principal Hicks and the officers, they were attempting to leave the lot.

Following juvenile's *voir dire* testimony and arguments from counsel, the trial court denied juvenile's motion to suppress. The court concluded the following:

> The case [*New Jersey v. T.L.O.*, 469 U.S. 325, 83 L. Ed. 2d 720 (1985)] does not apply. Those were not students of Mr. Hicks [sic].
>
> However, you have to look at the facts as they existed at the time of Mr. Hicks [sic] and the subsequent activity.
>
> Mr. Hicks has a right to talk to any person who is not a student who is on Hillside property, which is what he did.
>
> [Juvenile's] testimony is that the bus was gone. She was not there for the bus. They were leaving because they had missed that bus. They weren't on the property for the purpose of obtaining a ride from the bus. She testified to that herself.
>
> So, she is on school property. She is not a student at Hillside. He knows that she is not a student at Hillside. That was his testimony. And he does have a right to talk to anybody who is a potential trespasser on the school property. He talked to her.

She has no standing to contest the search of [S.J.'s] purse. None whatsoever. A weapon was discovered in [S.J.'s] purse. [Juvenile] was with [S.J.].

And so I agree, the detention of non-students in the school was in that nature of an arrest. They were detained without permission to leave and at that point the standard has to become in their minds they literally were detained and, therefore, arrested.

And so the standard changes obviously and he has to show that he has a right to search that individual. And if you view a detention as an arrest, it's a search incident to arrest. And if that is . . . (End of tape 1).

(Beginning of Tape 2) . . . to conduct a search incident to an arrest and a weapon was discovered.

The trial court denied juvenile's motion to dismiss at the close of the State's evidence. The juvenile was adjudicated delinquent and placed on supervised probation for one year subject to certain conditions. Juvenile appeals.

_____

[1] By her first assignment of error, juvenile argues that the trial court erred in failing to grant her motion to suppress. We disagree.

Our review of an order suppressing evidence is strictly limited. *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). In evaluating such an order, this Court must determine whether competent evidence supports the trial court's findings of fact. *Id.* Findings of fact supported by competent evidence are binding on appeal. *Id.* Although a trial court's findings of fact may be binding, we review its conclusions of law *de novo. State v. Mahaley*, 332 N.C. 583, 593, 423 S.E.2d 58, 64 (1992), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 649 (1995). We must not disturb the court's conclusions when they are supported by the factual findings. *Cooke*, 306 N.C. at 134, 291 S.E.2d at 619. Juvenile does not assign error to any of the trial court's findings. Therefore, we need only determine whether those findings support the court's ultimate conclusion. *State v. Cheek*, 351 N.C. 48, 63, 520 S.E.2d 545, 554 (2000).

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures, and is applicable to the several states through the Due Process Clause of the Fourteenth Amendment. *State v. Grooms*, 353 N.C. 50, 73, 540 S.E.2d 713, 727-28

**IN RE D.D.**

[146 N.C. App. 309 (2001)]

(2000). Generally, a search or seizure is valid under the Fourth Amendment where the police or other state actors possess a warrant based upon probable cause or, in some instances, simply obtain probable cause. *State v. Peaten*, 110 N.C. App. 749, 751, 431 S.E.2d 237, 238 (1993). However, there are certain circumstances which "make it impractical to secure a search warrant" or to obtain probable cause. *State v. Legette*, 292 N.C. 44, 56, 231 S.E.2d 896, 903 (1977).

In *New Jersey v. T.L.O.*, 469 U.S. 325, 83 L. Ed. 2d 720 (1985), the United States Supreme Court found that searches by school officials present such circumstances. The Court determined that the students retained a degree of privacy at school and, therefore, the Fourth Amendment's prohibition against unreasonable searches and seizures applied to students when being searched by school officials. However, the Court found that "[t]he warrant requirement . . . would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools." *Id.* at 340, 83 L. Ed. 2d at 733. The Court likewise found that "the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause[.]" *Id.* at 341, 83 L. Ed. 2d at 734.

In balancing students' right to privacy and the school officials' need to maintain discipline, the Supreme Court concluded that "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id.* Every jurisdiction, including North Carolina, having the occasion to do so, has adopted the *T.L.O.* standard for school searches. *See In re Murray*, 136 N.C. App. 648, 525 S.E.2d 496 (2000). *See generally Com. v. Cass*, 709 A.2d 350, 362-63 (Pa. 1998), *cert. denied*, 525 U.S. 833, 142 L. Ed. 2d 70 (1998); *In Interest of Doe*, 887 P.2d 645, 651-52 n.6 (Haw. 1994).

In the case *sub judice*, the trial court concluded that the evidence found in the search should not be suppressed but determined that *T.L.O.* did not apply because juvenile was not a Hillside student. Although we agree with the trial court's ultimate conclusion that the physical evidence in the present case was admissible, we disagree that the *T.L.O.* reasonableness standard was inapplicable. In fact, the search was constitutional under traditional Fourth Amendment principles. We are persuaded that the application of *T.L.O.* to the present case further strengthens the trial court's ruling.

IN RE D.D.

[146 N.C. App. 309 (2001)]

The *T.L.O.* Court concerned an assistant vice-principal searching the purse of one of his students. Several other courts have subsequently interpreted and applied *T.L.O.* in a variety of situations. We found no cases in this or other jurisdictions supporting the trial court's conclusion that *T.L.O.* does not apply to students who are not the students of the school official conducting the search. In fact, the policies expressed by the United States Supreme Court and other courts examining searches in the school setting indicate that the reasonableness standard announced in *T.L.O.* should apply, despite juvenile's status as a non-Hillside student.

The Supreme Court has repeatedly emphasized that school officials' power over students is "custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Vernonia v. Acton*, 515 U.S. 646, 655, 132 L. Ed. 2d 564, 576 (1995). However, "school personnel 'do not merely exercise authority voluntarily conferred on them by individual parents; rather, they act in furtherance of publicly mandated educational and disciplinary policies.' " *Earls v. Board of Educ. of Tecumseh School District*, 242 F.3d 1264, 1268 (10th Cir. 2001)(quoting *T.L.O.*, 469 U.S. at 336, 83 L. Ed. 2d at 731).

As indicated *supra*, inherent in the educational setting is a need to maintain "swift and informal disciplinary procedures." *T.L.O.*, 469 U.S. at 340, 83 L. Ed. 2d at 733. Schools are "unique environment[s]," *Earls*, 242 F.3d at 1269, where officials *must* be able to "move quickly when dealing with immediate threats to a school's 'proper educational environment' " and student safety. *Com. v. J.B.*, 719 A.2d 1058, 1062 (Pa. Super. 1998) (quoting *T.L.O.*, 469 U.S. at 339, 83 L. Ed. 2d at 733).

> School officials not only educate students who are compelled to attend school, but they have a responsibility to protect those students and their teachers from behavior that threatens their safety and the integrity of the learning process. With the growing incidence of violence and dangerous weapons in schools, this task has become increasingly difficult.

*In Interest of Angelia D.B.*, 564 N.W.2d 682, 689 (Wis. 1997).

We recognize that one who is not a student such as juvenile, certainly retains a degree of privacy when traveling to other campuses during school hours. We further recognize that one who is not a student does not have the relationship with school officials from other

schools that they possess with those within their own schools. *See T.L.O.*, 469 U.S. at 349, 83 L. Ed. 2d at 740 (Powell, J., concurring) (noting that there exists "a commonality of interests between teachers and their pupils" and that the teacher has a sense of "personal responsibility for the student's welfare as well as for his education"). However, in the present case, the school official testified that he had an obligation to report the non-students' unauthorized presence on his campus, thus having some, albeit slight, control and custodial relationship with non-Hillside students. Furthermore, the school-aged students who were filtering into the parking lot at the time of the encounter, represented a possible threat to their own safety, as well as a threat to the school staff and student body.

In balancing the non-Hillside students' privacy interest against Principal Hicks' obligation to maintain both a safe and educational environment, the facts of this particular case weigh in favor of applying the *T.L.O.* reasonableness standard. Furthermore, we agree with the State that not applying *T.L.O.* to the facts presented *sub judice* could lead to absurd results. It is difficult to imagine, given Principal Hicks' obligations in the school setting, that our law would prohibit him from approaching the non-Hillside students and taking further action simply based upon the students' status as non-Hillside students. As such, we conclude that, contrary to the trial court's reasoning, the *T.L.O.* standard should have been applied to the search of juvenile, despite her status as a non-Hillside student.

Juvenile argues that *T.L.O.* does not apply to the present case because Principal Hicks was acting at the direction of law enforcement officers and not by his own volition. In support of her argument, juvenile notes that contrary to the present case, *T.L.O.* involved a search by a school official with no law enforcement involvement.

We recognize that the *T.L.O.* Court expressly limited its holding to situations where the search of a student was conducted solely by a school official. *See T.L.O.*, 469 U.S. at 341 n.7, 83 L. Ed. 2d at 735. However, since the Supreme Court handed down the *T.L.O.* decision, courts have applied *T.L.O.*'s lower standard to school searches that concern various degrees of law enforcement involvement. In determining whether to apply the *T.L.O.* standard, courts consider "the role of law enforcement agent, as well as the nature and extent of the officer's participation in the investigation and search[.]" *In Re Josue T.*, 989 P.2d 431, 436 (N.M. Ct. App.), *cert. denied*, 128 N.M. 149, 990 P.2d 823 (1999).

IN RE D.D.

[146 N.C. App. 309 (2001)]

Generally, school search cases fall into three categories. First, courts apply the *T.L.O.* reasonableness standard to those cases where a school official initiates the searches on his own or law enforcement involvement is minimal. *Angelia, D.B.*, 564 N.W.2d at 687. Courts characterize these cases as ones in which the police officers act "in conjunction with" the school official. *See Cason v. Cook*, 810 F.2d 188, 192 (8th Cir.), *cert. denied*, 482 U.S. 930, 96 L. Ed. 2d 704 (1987).

More recently, the *T.L.O.* standard has also been applied to cases where a school resource officer conducts a search, based upon his own investigation or at the direction of another school official, in the furtherance of well-established educational and safety goals. *Id.*; *People v. Dilworth*, 661 N.E.2d 310 (Ill. 1996), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 793 (1996); *J.B.*, 719 A.2d at 1961 (Pa. Super. 1998); *see Angelia D.B.*, 564 N.W.2d at 688. Generally, cases applying the *T.L.O.* standard to searches conducted pursuant to the school police officer's own investigation, do so where the officer is " 'employed by a school district[,]' and [is] 'ultimately responsible to the school district,' " rather than the local police department. 4 Wayne R. LaFave, *Search and Seizure* § 10.11, at 144 (3d ed. 1996 & Supp. 2001) (quoting *Dilworth*, 661 N.E.2d at 323 (Nickels, J., dissenting)); *See State v. D.S.*, 685 So.2d 41, 43 (Fla. Dist. Ct. App. 1997) ("even if school police officer had directed, participated, or acquiesced in the search" the *T.L.O.* standard applies because "*school* police officer is a school official who is employed by the district School Board").

Courts draw a clear distinction between the aforementioned categories of cases and those cases in which outside law enforcement officers search students as part of an independent investigation or in which school official search students at the request or behest of the outside law enforcement officers and law enforcement agencies. *Angelia D.B.*, 564 N.W.2d at 687. Courts do not apply *T.L.O.* to these cases but instead require the traditional probable cause requirement to justify the search. *See, e.g., F.P. v. State*, 528 So.2d 1253 (Fla. Dist. Ct. App. 1988); *State v. Tywayne H.*, 933 P.2d 251 (N.M. Ct. App. 1997), *cert. denied*, 123 N.M. 83, 934 P.2d 277 (1997); *In Interest of Thomas B.D.*, 486 S.E.2d 498 (S.C. App. Ct. 1997). The purpose of the search conducted by so-called " 'outside' police officers" is not to maintain discipline, order, or student safety, but to obtain evidence of a crime. *Josue T.*, 989 P.2d at 436-37 (citation omitted).

Our appellate courts have never directly examined the role of law enforcement in school searches as it relates to the application of the

IN RE D.D.

[146 N.C. App. 309 (2001)]

*T.L.O.* standard. However, in *Murray*, 136 N.C. App. 648, 525 S.E.2d 496, this Court applied the lower *T.L.O.* standard where an assistant principal requested that a school resource officer handcuff an uncooperative and disruptive student, enabling her to search the student's book bag. The *Murray* Court found that the school resource officer simply "acted to enable [the assistant principal] to obtain the bag and search it[,]" and therefore "did not search the bag himself, nor did he conduct any investigation on his own." *Id.* at 650, 525 S.E.2d at 498. This Court concluded that because the search in question was conducted by the school official, *T.L.O.* squarely applied. *Id.*

Juvenile argues that *Murray* is distinguishable from the present case because several facts indicate that the search at issue not only involved police officers, but that the officers actually directed the conduct of the principal. To support her argument, juvenile notes, *inter alia*, that in the present case, the three officers were present during the entire event. Principal Hicks sought the officer's guidance throughout the entire encounter, and the officers prevented the females from leaving the parking lot. Given the depth of the officers' involvement, juvenile argues that the lower *T.L.O.* standard applicable in *Murray* does not apply to the case *sub judice*. We disagree.

We recognize that there are distinctions between the situation existing in *Murray* and the one presented by the case *sub judice*. However, the *Murray* Court did not limit the application of the *T.L.O.* reasonableness standard to the facts of that case. Furthermore, in finding the *T.L.O.* standard applicable, the *Murray* Court referenced cases from other jurisdictions in which courts concluded that *T.L.O.'s* standard applied where "a police officer *works in conjunction with* school officials," in varying degrees, to maintain a safe and educational environment. *Cason*, 810 F.2d at 192; *see also Martens v. District No. 220, Bd. of Educ.*, 620 F. Supp. 29 (N.D. Ill. 1985); *Coronado v. State*, 806 S.W.2d 302 (Tex. App. 1991), *rev'd on other grounds*, 835 S.W.2d 636 (Tex. Crim. App. 1992).

The application of *T.L.O.* in situations where law enforcement acts in conjunction with school officials is based on the premise that

> [a] police investigation that includes the search of a public school student, when the search is initiated by police and conducted by police, usually lacks the "commonality of interests" existing between teachers and students. But when school officials, who

IN RE D.D.

[146 N.C. App. 309 (2001)]

are responsible for the welfare and education of all of the students within the campus, initiate an investigation and conduct it on school grounds in conjunction with police, the school has brought the police into the school-student relationship.

*Angelia, D.B.*, 564 N.W.2d at 688 (quoting *T.L.O.*, 469 U.S. at 350, 83 L. Ed. 2d at 740) (citation omitted). When school officials bring police officers into the school setting, officers are to assist "the school administration in creating and sustaining a safe environment conducive to learning." *Josue T.*, 989 P.2d at 437. As noted *supra*, school officials' duty to protect "students and their teachers from behavior that threatens their safety" has become a difficult task "[w]ith the growing incidence of violence and dangerous weapons in school." *Angelia D.B.*, 564 N.W.2d at 689 (citations and footnotes omitted). "It could be hazardous to discourage school officials from requesting the assistance of available trained police [officers]," as teachers and other school officials are "generally . . . untrained in proper pat down procedures or in neutralizing dangerous weapons." *Id.*, 564 N.W.2d at 690.

We are persuaded by the aforementioned reasoning that the *T.L.O.* standard should apply in this jurisdiction where the officers act "in conjunction with" school officials. We are likewise convinced that such was the situation existing in the case *sub judice*.

These facts notwithstanding, we conclude that given the totality of the evidence, the officers' involvement was minimal relative to the actions of Principal Hicks and that at most, the officers acted in conjunction with the principal to further his obligations to maintain a safe, educational environment and to report truants from other schools. None of the officers initiated any investigation, nor were the officers directing Principal Hicks in an investigation to collect evidence of a crime. Rather, Principal Hicks "gathered" them together and requested *their* assistance in determining whether information received from the substitute teacher would materialize. Instructing the females to "hold on" when they attempted to walk away in the parking lot did not amount to an unauthorized detention by the officers, as juvenile argues on appeal, but simply enabled Principal Hicks to further investigate his suspicions. One officer requested to search one of the student's personal items and "grabbed" her purse before she could take it off her shoulder. Assuming, *arguendo*, that such a request amounted to an unauthorized search, juvenile, who was not the subject of the search, has no standing to challenge the propriety

of that search on appeal. *State v. Hudson*, 103 N.C. App. 708, 407 S.E.2d 583 (1991), *disc. review denied*, 103 N.C. 615, 412 S.E.2d 91 (1992). Most importantly, given the aforementioned facts, there was "no basis for thinking that [Principal Hicks'] action was a subterfuge to avoid warrant and probable cause requirements," *Marten*, 620 F. Supp. at 32; nor does the situation in the present case represent an effort to mask an investigation by "outside" police officers. *Compare Tywayne H.*, 933 P.2d at 254 (finding probable cause, not *T.L.O.*, standard applicable where outside officers hired by school-affiliated club for security-detail at school dance conducted a search on their own and with little contact with school officials); *F.P.*, 528 So.2d at 1254 (finding likewise where outside police officer investigating auto theft requested and received assistance of school resource officer).

Evidence gleaned from the suppression *voir dire* revealed little about the role of the officers in the school. However, it is reasonable to infer that at the very least the official duties of Officer May, referred to as the school's resource officer, were to assist in "maintaining a safe and proper educational environment[.]" *Angelia, D.B.*, 564 N.W.2d at 690. Furthermore, Principal Hicks testified that he understood this to be the role of all of the officers. Given this understanding, Principal Hicks sought their advice concerning certain police procedures, and we determine that the law enforcement responses were appropriate. Not allowing a school official to utilize the officers in such a manner is illogical and indeed defeats the officers' purpose for being on the school campus. *See id.* at 690. Given the circumstances existing in the present case, we conclude that the law enforcement officers acted in conjunction with Principal Hicks, and therefore the *T.L.O.* reasonableness standard should apply to the present case, despite law enforcement's involvement.

Finding *T.L.O.* applicable, we must next examine whether the search of juvenile was reasonable under the circumstances presented. *Murray*, 136 N.C. App. at 651, 525 S.E.2d at 499.

> Determining the reasonableness of any search involves a twofold inquiry: first, one must consider "whether the . . . action was justified at its inception," . . . second, one must determine whether the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place[.]" ibid.

*Id.* (quoting *T.L.O.*, 469 U.S. at 341, 83 L. Ed. 2d at 734 (omission in original) (citation omitted)). "[A] search of a student by a teacher or

other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *T.L.O.*, 469 U.S. at 341-42, 83 L. Ed. 2d at 734-35. The search is "permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342, 83 L. Ed. 2d at 735.

In the present case, Principal Hicks received certain information that non-Hillside students would come onto the school's campus to fight and that one Hillside student would be involved. Based upon his prior experience, the principal knew that when students come on campus to fight, they usually bring weapons with them to use. Furthermore, as found by the trial court, the principal had an obligation to confront any trespasser visiting the Hillside campus. As discussed *supra*, this obligation extended specifically to non-Hillside students, whose unauthorized presence Principal Hicks testified he was required to report.

Based upon the information possessed by Principal Hicks, he confronted the students, attempting to confirm or dispel any suspicion he had regarding the substitute teacher's information. The students were evasive, profane, and gave false names. Unable to dispel the possible suspicion that the student-aged females had come to fight and following the discovery of a weapon in the purse of one of the students, all of the students were escorted into the school and asked to empty their pockets. These facts provided Principal Hicks with sufficient grounds to believe that taking further action would reveal evidence of a crime or school rule violation.

Juvenile argues, based upon *Florida v. J.L.*, 529 U.S. 266, 146 L. Ed. 2d 254 (2000), that Principal Hicks' approach and subsequent search were not justified because they were based upon an anonymous tip. We disagree. In *J.L.*, an anonymous caller reported to the local police department that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* at 268, 146 L. Ed. 2d at 259. Officers approached a group of black males at the bus stop, observed defendant in a plaid shirt, and without observing anything suspicious, frisked defendant and seized a gun from his pocket. *Id.* The Supreme Court found that the anonymous tip, with nothing more, did not constitute a reasonable suspicion and therefore did not justify the subsequent frisk of defendant. The Court reasoned that "[u]nlike a tip from a known informant whose reputa-

tion can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.' " *Id.* at 270, 146 L. Ed. 2d at 260 (quoting *Alabama v. White*, 496 U.S. 325, 329, 110 L. Ed. 2d 301, 308 (1990)(citations omitted)).

*J.L.* is simply inapplicable in the present case. Assuming *arguendo* that information from the substitute teacher can be considered an "anonymous tip," it was not the basis of an immediate stop and frisk or search of the female students. Rather, the information received from the substitute teacher placed Principal Hicks on alert that disruptive activity may take place in a parking lot. The principal confronted the students based upon his authority to approach any trespasser on Hillside property and not solely based upon the substitute teacher's information. Only after his original suspicions were not dispelled, but indeed heightened by the behavior of the students and their false answers to reasonable questions were the students taken into the principal's office.

Juvenile further argues that her detention and subsequent search of her cohorts was not reasonable because a public bus stop exists in the parking lot. We also disagree with this argument. We recognize that testimony at the suppression *voir dire* concerning the location of the city bus stop and the females' location in relation to that city bus stop was, at best, ambiguous. However, the location of the bus stop in the parking lot does not abrogate Principal Hicks' duty to record the truancy of school-aged individuals. Furthermore, Principal Hicks maintained that the parking lot was school property and that students were not authorized to be in the lot when he noticed the presence of the Hillside student and her companions. Given these facts, we cannot say that approaching the students was unreasonable, despite the location of a bus stop in the lot.

Concerning part two of the *T.L.O.* reasonableness test, we conclude that the scope of the search in question was not unnecessarily intrusive in light of the circumstances. The non-Hillside students became profane and disruptive in the parking lot, as Principal Hicks attempted to question the Hillside student and further ascertain which school the girls attended. The girls joked about not being in school. As noted by Principal Hicks, he and the officers had to listen to "a lot of back talk." After Principal Hicks could not ascertain necessary information from brief cellular phone calls and when Officer May found the box cutter, concern for student safety was heightened.

Escorting the females to the office, where the principal could obtain more information without the distractions of a parking lot, and then simply requesting the students to empty their pockets was not unnecessarily intrusive. Accordingly, we conclude that the trial court properly denied juvenile's motion to suppress.

By her second assignment of error, juvenile contends that the trial court erred in denying her motion to dismiss based upon the insufficiency of the evidence. Juvenile first argues that because the knife discovered on her person was improperly admitted, there was no evidence to support her adjudication for possession of a weapon on educational property. Given our resolution of juvenile's first assignment of error, we find juvenile's contention to be wholly without merit.

[2] Juvenile next contends that there was insufficient evidence to support her conviction because there no evidence indicating that she possessed a knife on Hillside property. Juvenile argues that the parking lot was not "educational property," as specified by the statutory authority under which she was adjudicated delinquent, because a city bus stop was located on the property. We disagree.

In reviewing a challenge to the sufficiency of evidence, we must determine whether there was substantial evidence to support the adjudication, viewing the evidence in the light most favorable to the State and giving it the benefit of all reasonable inferences. *State v. Fritsch*, 351 N.C. 373, 378-79, 526 S.E.2d 451, 455, *cert. denied*, 531 U.S. 890, 148 L. Ed. 2d 150 (2000). The petition alleged that juvenile was delinquent in that she violated North Carolina General Statutes section 14-269(d), which prohibits the possession of certain specified weapons "on educational property." N.C. Gen. Stat. § 14-269.2(d) (1999). Principal Hicks testified that the parking lot, in which he located juvenile and her cohorts, was Hillside property. There was evidence that a city bus stopped in the Hillside parking lot. However, given Principal Hicks' testimony that the parking lot was school property and construing all evidence concerning the nature of the lot in the light most favorable to the State, juvenile's argument fails, and we conclude that there was sufficient evidence to support her conviction under section 14-269.2(d).

We note that in the order appealed, the trial court incorrectly cited the statutory provision under which juvenile was adjudicated delinquent as "G.S. 14-269," rather than section 14-269.2(d). Consequently, we remand the present appeal for the limited purpose

of allowing the trial court to make this clerical correction in its order to reflect the proper statutory provision.

For the foregoing reasons, we affirm the juvenile's adjudication of delinquency and remand for the limited purpose of correcting the clerical error in the adjudication order.

Affirmed in part; remanded in part.

Judges CAMPBELL and JOHN concur.