607 S.E.2d 304 (2005)
In the Matters of J.F.M. and T.J.B.
No. COA04-183.
Court of Appeals of North Carolina.
January 18, 2005.
Attorney General Roy Cooper, by Assistant Attorney General Elizabeth N. Strickland, for the State's case against J.F.M.
Attorney General Roy Cooper, by Assistant Attorney General Gaines M. Weaver, for the State's case against T.J.B.
Joal H. Broun, Carrboro, for respondent-appellant J.F.M.
Jon W. Meyers, Lexington, for respondent-appellant T.J.B.
*305 McCULLOUGH, Judge.
Arising from the same contended facts and circumstances, sisters J.F.M. ("JM") and T.J.B. ("TB") (collectively "juveniles") were adjudicated delinquent on petitions alleging resisting, delaying, and obstructing a public officer and assault on a public officer. Both adjudications were rendered 26 July 2003. On 21 July 2003, the juveniles' disposition orders placed each on twelve (12) months' probation with varying terms and conditions.
The State's evidence tended to show the following: On the day of 15 May 2003, JM was aged 15 and TB was aged 13. That day, Deputy S.L. Barr ("Deputy Barr") of the Forsyth County Sheriff's Department, and the Kennedy Learning Center's (the "Center") resource officer, was investigating an affray involving TB and another student. The affray occurred at around 2:00 p.m., and while not observing the affray, Deputy Barr had observed a group of students circled outside on the Center's grounds. Later, he saw TB leaving the grounds and gave her three commands to stop which she ignored. Continuing his investigation, he spoke with a school administrator who told him that TB had been in the affray and was leaving campus.
Later, at approximately 3:00 p.m., Deputy Barr was leaving the Center when he saw TB at the bus stop on the corner of Highland and Martin Luther King Boulevard, which was on the Center's grounds. He was still on duty. Stopping his vehicle, he approached TB and told her that she needed to come back to the Center to talk to the school administrator about the affray, and see whether she was going to be suspended. He himself did not plan on questioning her. TB told the Deputy, "I'm not going with you anywhere," and Deputy Barr responded by grabbing her arm and telling her she needed to come with him. At that point, JM pushed Deputy Barr and told him to "get [his] D hands off her sister, and told [TB] to run." Deputy Barr told JM that she was under arrest for resisting and delaying an officer, and grabbed her arms when she tried to run. As she struggled against his attempt to handcuff her, she bit him on the right arm. TB returned and struck Deputy Barr with an umbrella. He let go of JM and the two sisters ran down the street. Deputy Barr called for assistance, and then chased after *306 the two girls. The two sisters were soon apprehended. The sisters were so violent that they had to be placed in handcuffs and leg restraints to be placed into patrol cars.
At the close of the State's evidence, the juveniles' motion for dismissal was denied.
By way of their testimony, the juveniles' case tended to allege the following: TB had been in a fight on 15 May 2004, and having discussed the matter with the school administrator was authorized to leave the Center. At the bus stop, Deputy Barr pulled up and told TB to come with him. JM, also at the bus stop, asked Deputy Barr, "why you want her to go with you." TB told the Deputy she was not going anywhere with him. While they began walking away, Deputy Barr spoke on his walkie-talkie. He then grabbed JM's hair and put his right arm around her neck. It was then that JM bit his arm. TB began hitting him with the umbrella, and after JM was freed, both fled.
At the close of the juveniles' evidence, they again moved for dismissal and were denied.
In their separate briefs on appeal the juveniles argue common issues of error by the trial court, and TB raises additional errors. The common issues are all founded on the contention that the trial court erred in finding Deputy Barr had authority to detain TB. TB's additional issues contend that the trial court was without jurisdiction to hear this matter where the petitions for TB were fatally deficient. Based on the analysis herein, we find no error by the trial court's adjudication and disposition orders of the juveniles.

Common Issues  Motions to Dismiss
The juveniles contend Deputy Barr was without legal authority to detain TB at the bus stop, amounting to an unlawful arrest, and therefore their resistance to Deputy Barr was lawful. Thus, they allege the court erred when it denied their motions to dismiss. We do not agree.
In cases where the juvenile moves to dismiss, the trial court must determine "whether there is substantial evidence (1) of each essential element of the offense charged, ... and (2) of [juvenile's] being the perpetrator of such offense." In re Heil, 145 N.C.App. 24, 28, 550 S.E.2d 815, 819 (2001) (quoting State v. Powell, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980) (citations omitted)). If the evidence raises merely "suspicion or conjecture" as to the offense's commission, or the identity of the juvenile as its perpetrator, the motion should be allowed. Id."In reviewing a challenge to the sufficiency of evidence, it is not our duty to weigh the evidence, but to determine whether there was substantial evidence to support the adjudication, viewing the evidence in the light most favorable to the State, and giving it the benefit of all reasonable inferences." Id. at 29, 550 S.E.2d at 819. However, because juveniles in no way deny the events which took place subsequent to Deputy Barr's detention of TB, the sufficiency of the evidence is not in question. Rather, it is the legal framework in which those events fell that is before us. Thus, we apply the evidence, viewed in a favorable light to the State, to what we hold below to be the proper legal framework.
In New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), the United States Supreme Court determined that a search of a student's purse, conducted by a school official, and with some level of suspicion that the purse contained contraband, did not require that level of suspicion be probable cause. The Court, expounding on the principles of its seminal decision in Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905 (1968), reasoned:
Where a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause, we have not hesitated to adopt such a standard.
New Jersey, 469 U.S. at 341, 105 S.Ct. at 742, 83 L.Ed.2d at 734. Pursuant thereto, the Court adopted a looser reasonableness standard for school searches by school administrators, applying a twofold inquiry as to whether this standard has been met:
[T]he accommodation of the privacy interests of school children with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the *307 requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search.
Id. at 341, 105 S.Ct. at 742, 83 L.Ed.2d at 734. Recently, the Fourth Circuit extended T.L.O.'s reasonableness standard to the context of detainment of a student, tantamount to seizure under the Fourth Amendment, stating that:
It would be an odd state of affairs to tie school officials' hands merely because fulfillment of this mandate requires the detention, not the inspection, of a pupil. We thus address appellants' claim of illegal seizure under the rubric announced in T.L.O.

Wofford v. Evans, 390 F.3d 318, 326 (4th Cir. 2004) (seizure of a student suspected of possessing a gun at school).
While the holding in T.L.O. was limited to searches by school administrators and officials, our Court has recently adopted an extension of this reasonableness standard to searches conducted by law enforcement officials. We have since held that the T.L.O. standard governs searches conducted by resource officers working "`in conjunction with' school officials," where these officers are primarily responsible to the school district rather than the local police department. In re D.D., 146 N.C.App. 309, 320, 554 S.E.2d 346, 353-54, appeal dismissed and disc. review denied, 354 N.C. 572, 558 S.E.2d 867 (2001); see also, In re Murray, 136 N.C.App. 648, 651, 525 S.E.2d 496, 499 (2000) (applying the T.L.O. standard to a search conducted by a law enforcement officer at the behest of a school administrator).
We are now faced with the question of what is the required level of suspicion for a school resource officer, who, acting in conjunction with school officials, detains a pupil. As no North Carolina case law has yet addressed this set of facts, we look to the above stated principles and extensions of T.L.O. for our determination. In light of the underlying rationale for the extension of T.L.O.'s standard for temporary detainment of a pupil as found in Wofford, and its extension to searches by resource officers working in conjunction with school officials as found in In re D.D., we hereby find applicable the T.L.O. standard to incidents where a resource officer, acting in conjunction with a school official, detains a student on school premises.
Before applying T.L.O. to the case at bar, we must first determine whether Deputy Barr was acting in conjunction with the school administrator. In re D.D., 146 N.C.App. at 321, 554 S.E.2d at 353-54. We are convinced he was.
On the day in question, Deputy Barr, as the Center's resource officer, was called upon to investigate an affray involving TB. After observing a circle of students outside, he saw TB leaving the school grounds and commanded three times that she stop. She did not. He then spoke with a school administrator who confirmed that TB had been involved in the affray, and that she had left campus. Approximately 45 minutes from that discussion, Deputy Barr was leaving campus when he saw TB still at the bus stop on school property. He was still on duty and the school day had concluded within the hour. Close in time to speaking with the administrator and conducting the investigation, Deputy Barr sought to detain TB for the sole purpose of taking her to the administrator to determine whether she would be suspended for her actions. When she turned to walk away, he grabbed her arm and told her to come with him.
We believe that based upon these facts the resource officer was clearly acting in conjunction with the school administration. Practicality demands that a school administrator must be able to rely on some autonomy by a resource officer in conducting an investigation on school premises, and we believe this necessarily includes an officer's ability to detain a student outside the presence of an administrator for the purpose of presenting them to an administrator. The facts clearly indicate that Deputy Barr intended immediately to present TB to the administrator in order to discuss the ramifications of her actions under the rules and policies of the school, not as violations of the *308 laws of North Carolina. The detainment occurred while he was on duty, on school premises, and close in time to his investigation.
We now apply the T.L.O. standard to determine whether Deputy Barr's seizure of TB was reasonable. In doing so, we apply the twofold consideration as set out in T.L.O., and as applied in Murray; In re D.D., and Wofford:
Determining the reasonableness of any search involves a twofold inquiry: first, one must consider "whether the ... action was justified at its inception," Terry v. Ohio, [392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905 (1968)]; second, one must determine whether the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place[.]"
T.L.O., 469 U.S. at 341, 105 S.Ct. at 742-43, 83 L.Ed.2d at 734; Murray, 136 N.C.App. at 651, 525 S.E.2d at 499; In re D.D., 146 N.C.App. at 321, 554 S.E.2d at 353-54; and Wofford, 390 F.3d at 326-27.
A search is lawful at its inception when there are "reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." T.L.O., 469 U.S. at 342, 105 S.Ct. at 743, 83 L.Ed.2d at 735. "Analogously, a school official may detain a student if there is a reasonable basis for believing that the pupil has violated the law or a school rule." Wofford, 390 F.3d at 326. An affray is a violation of North Carolina law, and necessarily a violation of North Carolina school rules and policy. N.C. Gen.Stat. § 14-33 (2003). The evidence reasonably infers the following: Deputy Barr, acting as a school resource officer known to TB, saw TB on school grounds after observing a group of students circled around what appeared to be an affray. He commanded three times that she stop and she ignored him. He then spoke with the school administrator who indicated to him that TB had been involved in the affray. Seeing TB close in time after speaking with the school administrator, he detained her. We believe this is sufficient to satisfy as reasonable grounds to detain.
We next consider whether the seizure was "reasonably related in scope to the circumstances which justified [it] in the first place." T.L.O., 469 U.S. at 341, 105 S.Ct. at 742, 83 L.Ed.2d at 734. The evidence indicated that TB had been involved in an affray. There was conflicting evidence as to whether TB had resolved the matter of the affray with the Center's administration. Close in time to the affray and his discussion with the school administrator, Deputy Barr came across TB on school grounds. In light of the potential danger of allowing the matter to carry over into another school day, we believe these circumstances justified TB's temporary detainment to resolve the matter. It is reasonable to infer that TB was well aware of her own culpability as justification for the resource officer's detainment. And while we are concerned by the evidence that the resource officer grabbed her arm for such detainment, upon these circumstances, we do not think this amounted to a Fourth Amendment violation. Because Deputy Barr otherwise had authority to detain her, the fact that TB's resistance escalated the measures Deputy Barr employed for the purposes of such detainment does not implicate the Fourth Amendment. See, e.g., In re Joseph F., 85 Cal.App.4th 975, 985, 102 Cal.Rptr.2d 641 (2000) (the First Appellate District of California found that where a school resource officer otherwise has authority to detain a juvenile on school grounds, the Fourth Amendment is not violated where a juvenile resisted the officer's efforts and the level of force to effect the lawful detention escalated). Thus, we believe there was sufficient justification to satisfy the second part of the T.L.O. test.
Based upon our conclusion that the detainment of TB by Deputy Barr was lawful and did not amount to an arrest, the undisputed resistance and assaults on Deputy Barr by FM and TB that ensued were without legal justification. Therefore, the court did not err in denying the motions to dismiss these petitions.
These assignments of error are overruled.

TB's Additional Issues  The Petitions
Next, TB contends the trial court lacked jurisdiction to adjudicate TB delinquent. *309 She argues that the petitions charging her were fatally deficient because an essential element of each offense was not alleged. We do not agree.
When a petition is fatally deficient, it is inoperative and fails to evoke the jurisdiction of the court. In re Green, 67 N.C.App. 501, 504, 313 S.E.2d 193, 195 (1984). Because juvenile petitions are generally held to the standards of a criminal indictment, we consider the requirements of the indictments of the offenses at issue. In re Griffin, 162 N.C.App. 487, 493, 592 S.E.2d 12, 16 (2004). "[O]ur Supreme Court held that indictment for the charge of resisting an officer must: 1) identify the officer by name, 2) indicate the official duty being discharged, and 3) indicate generally how defendant resisted the officer." State v. Swift, 105 N.C.App. 550, 553, 414 S.E.2d 65, 67 (1992); see N.C. Gen.Stat. § 14-223 (2003). An indictment for assault on a government officer requires allegations that the offender assaulted "an officer or employee of the State or any political subdivision of the State, when the officer or employee is discharging or attempting to discharge his official duties[.]" N.C. Gen.Stat. § 14-33(c)(4) (2004).
The petition alleging resisting, delaying and obstructing an officer by TB states in relevant part:
[T]he juvenile did unlawfully and willfully resist, delay and obstruct (name officer) S.L. Barr, by holding the office of (name office) Deputy (describe conduct) delay and obstructing a public [officer] in attempting to discharge a duty of his office.
At the time, the officer was discharging and attempting to discharge a duty of his/her (name duty) investigate and detain [TB] whom was involved in an affray[.] This offense is in violation of G.S. 14-233.
The same is true for the petition alleging assault on a government officer/employee, stating in relevant part:
ASSAULT ON A GOVERNMENT OFFICER/EMPLOYEE [G.S. 14-33(c)(4)] and strike (name person) STANLEY BARR a government [ ] officer [] employee, by Forsyth County Sheriff' [sic] Office. At the time of the offense the officer or employee named above was attempting to discharge the following duty of his/her office or employment INVESTIGATING A DISTURBANCE ON SCHOOL GROUNDS.
On their face, we hold that these petitions were sufficient to apprise TB of the specific allegations alleged against her, including each element thereof, thus enabling her to prepare an adequate defense. See In re Griffin, 162 N.C.App. at 493, 592 S.E.2d at 16. Thus, the district court had jurisdiction to adjudicate these matters.
These assignments of error are overruled.
After thorough review of the briefs, record, and transcript, we find the juveniles received fair adjudication and disposition hearings.
No error.
Chief Judge MARTIN and Judge STEELMAN concur.