v.

**STATE of Indiana, Appellee–Petitioner.**

**No. 49A02–0603–JV–268.**

Court of Appeals of Indiana.

March 27, 2007.

Teresa D. Harper, Bloomington, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Monika Prekopa Talbot, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

ROBB, Judge.

*Case Summary and Issues*

T.S., a minor, appeals from a proceeding in which he was adjudicated a juvenile delinquent based on the juvenile court's finding that T.S. committed an act that if committed by an adult would be the crime of possession of marijuana, a Class A misdemeanor. On appeal, T.S. raises the sole issue of whether the trial court erred in denying T.S.'s motion to suppress evidence he claims was obtained in violation of Article I, Section 11 of the Indiana Constitution, and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Concluding that the procedure through which the evidence against T.S. was obtained did not violate T.S.'s federal or state constitutional rights, we affirm.

*Facts and Procedural History*

On October 13, 2005, Sergeant Mark Driskell, of the Indiana Public Schools Police ("IPSP"), received a phone call in the Broad Ripple High School ("BRHS") IPSP office. Sergeant Driskell testified that "[t]here was a female who [sic] I did not identify.... [S]he indicated that there was a student at Broad Ripple high school by the name of [T.S.] and that he had marijuana in right front pant pocket." Transcript at 23. Sergeant Driskell testified that he had "no idea" who the anonymous caller was. *Id.* at 13. The tipster did not state how she knew T.S. had marijuana in his possession. *Id.* at 14.

After receiving this call, Sergeant Driskell went to T.S.'s gym class, and told him to accompany him to the locker room. Sergeant Driskell testified that this call was the only basis on which he removed T.S. from class. After reaching the locker room, Sergeant Driskell told T.S. to change out of his gym uniform into his street clothes. After T.S. had finished dressing, Sergeant Driskell asked T.S. if "he had anything on him that he shouldn't have." *Id.* at 38. At this point, T.S. pulled a small plastic baggie containing marijuana out of his front pocket and handed it to Sergeant Driskell. Sergeant Driskell then reached into T.S.'s pocket and pulled out another small baggie of marijuana. T.S. gave a slightly different description of the events. T.S. testified that when they reached the locker room, Sergeant Driskell told T.S. about the anonymous tip, put his hand on T.S.'s chest, and said that he knew T.S. had some marijuana because his heart was beating quickly. T.S. testified he then told Sergeant Driskell that he did have marijuana, walked over to his locker, and opened it.

T.S. testified that when he opened his locker, Sergeant Driskell grabbed T.S.'s pants out, went through the pockets, and pulled out the two baggies of marijuana. When asked about T.S.'s version of events, Sergeant Driskell testified that he did not recall placing his hand on T.S.'s chest and that T.S. had handed him the first baggie of marijuana.

On March 20, 2006, T.S. filed a motion to suppress the evidence obtained during the encounter with Sergeant Driskell. The trial court did not rule on this motion prior to T.S.'s delinquency hearing. During the hearing, T.S. objected at all relevant times to the introduction of physical and testimonial evidence regarding the encounter between T.S. and Officer Driskell. The trial court overruled the objections and allowed the evidence to be admitted. Following the hearing, the trial court entered a true finding as to T.S.'s delinquency, and ordered T.S. to continue probation. T.S. now appeals.

*Discussion and Decision* [1]

I. Standard of Review

Generally, we review a trial court's admission of evidence only for abuse of discretion. *Smith v. State*, 839 N.E.2d 780, 784 (Ind.Ct.App.2005). We will find that a trial court has abused its discretion when its "decision is clearly erroneous and against the logic and effect of the facts and circumstances before the court." *Id.* However, "[a]lthough a reviewing court should deferentially review trial court findings of historical fact, giving due weight to inferences drawn from those facts, the determinations of reasonable suspicion and probable cause for warrantless searches is [sic] to be determined on a de novo standard on appeal." *Myers v.*

---

**1.** We held oral argument in this case on February 22, 2007, at Indiana State University in Terre Haute. We thank counsel for their advocacy and extend our appreciation to Indiana State for hosting the oral argument.

*State*, 839 N.E.2d 1154, 1160 (Ind.2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 2295, 164 L.Ed.2d 814 (2006).

## II. The Admission of Evidence

### A. The Fourth Amendment in Schools

▆▆▆ The seminal case regarding searches and seizures that occur in schools is *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). In *T.L.O.*, the United States Supreme Court held that the Fourth Amendment does apply to school searches and seizures, but that:

> The accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search.

*Id.* at 341, 105 S.Ct. 733. The Court developed a two prong test for determining the reasonableness of a search: (1) whether the action was justified at its inception; and (2) whether the search "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The first prong will be satisfied if "there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id.* The second prong will be satisfied if "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of

the infraction." *Id.* In *T.L.O.*, the Court explicitly left open the question of whether the exclusionary rule applied to school searches. *Id.* at 333 n. 3, 105 S.Ct. 733. However, the decisions of Indiana courts subsequent to *T.L.O.* indicate that the exclusionary rule is the remedy for Fourth Amendment violations occurring in schools. *See Myers*, 839 N.E.2d at 1161 (holding that trial court properly denied defendant's motion to suppress because search conducted by school officials was reasonable); *D.I.R. v. State*, 683 N.E.2d 251, 253 (Ind.Ct.App.1997) (reversing defendant's delinquency adjudication because evidence was discovered during unreasonable search in a school).

*T.L.O.* left open many questions with which courts still struggle. The case before us raises three questions undecided by *T.L.O.*: (1) the level of cause required for an IPSP officer who initiates an encounter with a student without the involvement of other school officials; (2) whether the encounter between Sergeant Driskell and T.S. constituted a seizure; and (3) the standard for determining the constitutionality of a seizure occurring in a school.

### B. Sergeant Driskell's Status

▆▆▆ *T.L.O.* left open the question of what standard applies to searches conducted by police officers on school property, or by police officers employed by the school system. *See* 469 U.S. at 341 n. 7, 105 S.Ct. 733. However, our supreme court has noted that other jurisdictions divide school searches into three categories and use the following set of standards:

> (1) where school officials initiate the search or police involvement is minimal, the reasonableness standard is applied; (2) where the search is conducted by the school resource officer on his or her own initiative to further educationally related goals, the reasonableness standard is ap-

plied; and (3) where "outside" police officers initiate the search of a student for investigative purposes, the probable cause and warrant requirements are applied.

*Myers,* 839 N.E.2d at 1160. Our supreme court then stated

> We find this approach and analysis persuasive. Thus, where a search is initiated and conducted by school officials alone, or where school officials initiate a search and police involvement is minimal, the reasonableness standard is applicable. And the ordinary warrant requirement will apply where "outside" police officers initiate, or are predominantly involved in, a school search of a student or student property for police investigative purposes.

*Id.*

We note that our supreme court did not explicitly adopt the three categories used by other jurisdictions, and merely found them "persuasive." The language it used in announcing its test adopts the approach taken for the first and third categories, but omits the second category of a school resource officer acting on his or her own initiative. However, this omission can be explained because the facts of *Myers* made possible only a conclusion that the search fell under either the first or third categories.[2] We thus conclude that the *Myers*

court adopted the three-part test, and that the later statement omitting the second category is merely a restatement of the two categories relevant to the facts of *Myers.*[3] Therefore, we must decide whether Sergeant Driskell was an "outside" police officer or a school resource officer acting to further educationally related goals.

T.S. argues that we should consider Officer Driskell an "outside" officer. T.S. argues: "Police Sergeant Driskell acted alone, as part of a criminal investigation, and without immediate involvement and supervision of school officials when he went to the high school,[4] when he removed T.S. from gym class, when he questioned T.S. without advising him of Miranda warnings and without parent or guardian present,[5] and when he seized marijuana from the pocket of T.S.'s pants." Appellant's Br. at 9.

At oral argument, the State argued that Sergeant Driskell should not be considered an outside police officer. However, the State's argument in its brief on this issue is neither clear nor consistent. The State first argues that Sergeant Driskell was acting "not only as a law enforcement officer, but as a school official attempting to maintain order at the high school." Appellee's Br. at 4. However, the State also states, "The State acknowledges that Ser-

---

**2.** In *Myers,* the court concluded the search was conducted by police officers at the direction of the school, and that therefore, police involvement was limited. *Id.* at 1160.

**3.** Justice Sullivan's dissenting opinion indicates that he believes the court has adopted the three-category standard. *Id.* at 1161 ("I am willing to accept for purposes of analysis in this case the tripartite standard for determining the legality of searches conducted by school officials in conjunction with or at the behest of law enforcement agencies . . .").

**4.** T.S. apparently fails to recognize that Sergeant Driskell was already working in BRHS

when he received the call. *See* Tr. at 9 (testimony of Sergeant Driskell) ("I received a phone call in our police office of Broad Ripple High School."); Appellant's Appendix at 10 (Probable Cause Affidavit indicating that Sergeant Driskell was working at BRHS when he received the call).

**5.** T.S. does not argue that evidence should be suppressed based upon Sergeant Driskell's questioning T.S. without first giving these warnings or waiting until T.S. had a parent with him.

geant Driskell is not a school official." *Id.* at 5. After making this concession, the State argues "police searches in schools should be held to a standard similar to the 'pure reasonableness' found in *T.L.O.*"[6] *Id.* Although the statements in the State's brief could be interpreted as a concession that Sergeant Driskell was an outside police officer, based on the conflicting nature of the statements in its brief, and its position at oral argument that Sergeant Driskell was not an outside police officer, we will not deem the State to have conceded this point, and will address the merits.

■ At the time of the incident, Sergeant Driskell was employed by the IPSP and was working in BRHS. He received the anonymous call in BRHS's IPSP office.[7] We have previously held that employees of the IPSP who act in their capacity as security officers are considered school officials and that their conduct is therefore governed by *T.L.O.* *S.A. v. State,* 654 N.E.2d 791, 795 (Ind.Ct.App. 1995), *trans. denied* (although officer was "a trained police officer, he was acting in his capacity as security officer for the IPS schools. [The officer] is employed by the IPS PD and as such, his conduct regarding student searches on school premises is governed by the test announced in *[T.L.O.]*"); *see also C.S. v. State,* 735 N.E.2d 273, 275 (Ind.Ct.App.2000), *trans. denied* (analyzing search conducted by IPSP officer under reasonableness standard); *c.f. Myers,* 839 N.E.2d at 1161 (Sullivan, J., dissenting) (arguing that "there is

nothing in the record to suggest that any of the officers involved in this case were only school police or liaison officers as they were in all of the cases cited by the Court").

As *S.A.* and *C.S.* were decided before our supreme court adopted the three-part test in *Myers,* T.S. argues that to the extent *C.S.* determined the relevant standard for school police officers, *C.S.* has been superceded by *Myers.* Appellant's Br. at 10 n. 4. Therefore, we will briefly discuss the relevant characteristics of the IPSP, and determine whether it is necessary to revisit our analysis of IPSP officers in light of *Myers.*

Under Indiana statute, "[t]he safety board may ... appoint and swear an additional number of special police officers ... to do special duty within the city." Ind. Code § 36–8–3–7(a). "Unless the safety board designates otherwise, the special police officers are subject to the police chief ... If they are employees of departments other than the police or fire department, they shall obey the rules of their respective departments." Ind.Code § 36–8–3–7(b). "The powers and duties of officers appointed to serve as security police for school corporations include: (1) the protection of school personnel while on school business, including school children, employees, and members of the governing body of the school corporation; and (2) the protection of all school corporation property." Ind.Code § 36–8–3–7(c). As demonstrated by the facts of this case, IPSP

---

**6.** The problem with this statement is that our supreme court has held that when a search in a school is conducted by outside police officers, standard warrant requirements apply. *Myers,* 839 N.E.2d at 1160. The State does not cite *Myers* anywhere in its brief.

**7.** At the time it submitted its brief, the State apparently did not realize that Sergeant Driskell was working at BRHS when he received

the call. In support of its argument that Sergeant Driskell corroborated part of the tip, the State says, "Sergeant Driskell went to [BRHS] and found Respondent." Appellee's Br. at 6. At oral argument, the State supported its argument that Sergeant Driskell was a school police office by pointing out that he was working at BRHS when he received the call.

officers have the power and authority to make arrests, and the same general powers and privileges of other police officers. *See* Indiana Public Schools Website, Are IPS Police Officers Police Officers?, www.police.ips.k12.in.us/Police + Powers/default.aspx (last visited March 20, 2007).

In addition to *S.A.* and *C.S.,* several cases from other jurisdictions have examined searches conducted by school police officers, coming to various conclusions based on various rationales. A Florida appellate court has explicitly stated that all school searches conducted by school police officers are governed by the reasonableness standard, regardless of the involvement of other school administrators or the purpose of the search. *State v. D.S.,* 685 So.2d 41, 43 (Fla.Ct.App.1996) (holding that school police officers are always subject to the reasonable suspicion standard for school searches "since the *school* police officer is a school official who is employed by the district School Board") (emphasis in original).

Other courts have held that searches conducted by school police officers were governed by the reasonableness standard based on the rationale that by ferreting out drugs, the officers were working in the furtherance of educational goals. *See In re S.W.,* 171 N.C.App. 335, 614 S.E.2d 424, 427 (2005), *review denied* ("In maintaining a proper educational environment, Deputy Carpenter's employment as a resource officer mandates that he help maintain a drug free environment at the school"); *Com. v. J.B.,* 719 A.2d 1058, 1066 (Pa.Super.1998) (holding reasonableness standard applies where school resource officer noticed student staggering in hallway, took student to school police office and searched student, noting that "there was a likelihood that Appellant, if under the influence of a controlled substance, could disrupt the learning environment").

Other courts have not based their holding solely on the officer's status as a school police officer, but have examined the involvement of other school administrators in the officer's action. *See In re J.F.M.,* 168 N.C.App. 143, 607 S.E.2d 304, 307–08 (2005), *review denied* (examining whether school resource officer was "acting in conjunction with the school administrator," and determining that he was, principally because he acted at the request of an administrator and "intended immediately to present [the student] to the administrator in order to discuss the ramifications of her actions under the rules and policies of the school, not as violations of the laws of North Carolina"); *In Interest of Angelia D.B.,* 211 Wis.2d 140, 564 N.W.2d 682, 690 (1997) (resting conclusion that school liaison officer's search was governed by reasonableness standard not on officer's status, but on facts that "[h]e became involved in this investigation only after school officials requested his assistance and, throughout the course of the investigation, he acted in conjunction with school officials on school grounds"); *People v. Dilworth,* 169 Ill.2d 195, 214 Ill.Dec. 456, 661 N.E.2d 310, 317 (1996), *cert. denied,* 517 U.S. 1197, 116 S.Ct. 1692, 134 L.Ed.2d 793 (1996) (school police officer was acting on his own authority in furtherance of educational purpose when he searched a student at request of school officials, and then after escorting student to his locker, searched student's flashlight out of presence of school administrators).

Finally, courts have found relevant the officer's purpose in conducting the search. *See J.F.M.,* 607 S.E.2d at 307–08 (officer was concerned with student's actions as violations "under the rules and policies of the school, not as violations of the laws of North Carolina"); *In re Josue T.,* 128 N.M. 56, 989 P.2d 431, 438 (1999), *review denied,* ("The nature of a *T.L.O.* search by

a school authority is to maintain order and discipline in the school. The nature of a search by a police officer is to obtain evidence for criminal prosecutions."); *State v. Tywayne H.*, 123 N.M. 42, 933 P.2d 251, 255 (N.M.Ct.App.1997), *review denied* (holding that search conducted by police officers hired as security for an after-school dance sponsored by local chapter of Mothers Against Drunk Driving was not governed by *T.L.O.* because the rationale of the student-teacher relationship, upon which *T.L.O.* was based, "is not applicable to a uniformed police officer conducting a search on his own initiative").

We conclude that Sergeant Driskell acted as school resource officer acting to further educationally related goals. Although Sergeant's Driskell's encounter with T.S. ultimately resulted in Sergeant Driskell taking T.S. to the police station,[8] Sergeant Driskell testified that, at the time he initiated the encounter, he intended to take T.S. to the Dean's office. Tr. at 33. Therefore, although Sergeant Driskell did not act in conjunction with other school officials prior to the initial contact with T.S., when he initiated contact, he had the intent to involve the school's dean. Such intent indicates that Sergeant Driskell was concerned with a possible violation of school rules, and not solely a criminal violation. We also agree with the rationale of the North Carolina and Pennsylvania courts that the presence of drugs on school property presents a serious threat to a learning environment. Therefore, Ser-

geant Driskell acted not only to ferret out criminal activity, but also to preserve an environment conducive to education.

We do not hold that any action by a school police officer is governed by *T.L.O.'s* reasonableness test. As our supreme court has indicated, this standard applies to school resource officers acting on their own initiative, and acting "to further educationally related goals." *Myers*, 839 N.E.2d at 1160. On the facts of this case, Officer Driskell was acting to further such goals, and we therefore will analyze his actions under the principles of *T.L.O.*

C. Whether T.S. Was "Seized"

Given our standard of review, we assume that T.S. handed Sergeant Driskell the first baggie of marijuana in response to his question of whether T.S. had anything he should not have. Therefore, it is not a "search" at issue, but the "seizure" of T.S.[9] *See G.J. v. State*, 716 N.E.2d 475, 478 (Ind.Ct.App.1999) (no "search" took place where student "voluntarily removed the vial of marijuana from his own pocket upon being asked by [the Dean] if he possessed marijuana."). Also, T.S. does not appear to argue that any search that occurred was illegal, but instead focuses on his seizure from gym class. Appellant's Br. at 14.

■■■ Under general Fourth Amendment principles, a seizure occurs "when, considering all the surrounding circumstances, the police conduct 'would have

8. The State misstates the record on this point. The State supports its argument that Sergeant Driskell was attempting to maintain order in the school by stating, "Sergeant Driskell did not take Respondent to a police station after being shown marijuana, but rather brought him to the dean's office." Appellee's Br. at 4. However, Sergeant Driskell testified, "I took him instead of the Dean's Office. I took him to the Police Office and arrested him for possession of marijuana." Tr. at 40.

9. Sergeant Driskell's act of reaching into T.S.'s pants to retrieve the second baggie may have constituted a search, but at this point, Sergeant Driskell clearly had probable cause, as T.S. had admitted that he had drugs, and Sergeant Driskell already had found the first baggie. In any event, no argument has been raised regarding Sergeant Driskell's removal of the second baggie of marijuana.

communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'" *Bentley v. State*, 846 N.E.2d 300, 305 (Ind.Ct.App.2006), *trans. denied* (quoting *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion)).

■ It is unclear whether the State argues that no seizure took place, or merely that any seizure that occurred was reasonable. *Compare* Appellee's Br. at 3 ("Officer Driscoll's [sic] actions did not constitute a stop.") *with id.* at 4 (conceding "Respondent probably did not feel free to decline Sergeant Driskell's requests," but arguing that "[t]he Supreme Court has recognized that there is a less demanding standard for searches in schools"). At oral argument, the State argued that the encounter did not constitute a seizure. The State cites no authority for the proposition that T.S. was not seized, but points out that when T.S. was in gym class, T.S.'s freedom was already restrained, as he was not free to leave the school due to Indiana's truancy laws.[10] The only support we have found for the State's apparent argument that T.S. was not seized comes from a California supreme court case, in which the court found it unnecessary to decide whether the encounter constituted a seizure, but noted "the conduct of school officials in moving students about the classroom or from one classroom to another, sending students to the office, or taking them into the hallway to ask a question would not seem to qualify as a detention as defined by the Fourth Amendment." *In re Randy G.*, 26 Cal.4th 556, 110 Cal.Rptr.2d 516, 28 P.3d 239, 244 (2001). Even courts that have held that a school seizure need not be supported by

reasonable suspicion refer to encounters between school officials and students in terms of a "seizure," "stop," or "detention," and analyze the encounter under Fourth Amendment principles. *See In re D.E.M.*, 727 A.2d 570, 577 (Pa.Super.Ct.1999); *J.D. v. State*, 920 So.2d 117, 122 (Fla.Ct.App.2006). Significant authority exists for the proposition that a security or school officer who compels or restrains a student's movement seizes the student for Fourth Amendment purposes. *See Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1305 (11th Cir.2006), *petition for cert. filed*, 75 U.S.L.W. 3355, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d —— (U.S. Dec. 27, 2006) (No. 06–895) (finding that officer had a reasonable basis "for calling [student] over to him, i.e., stopping her, and asking her questions"); *People v. Kline*, 355 Ill.App.3d 770, 291 Ill.Dec. 719, 824 N.E.2d 295, 298 (2005), *appeal denied; State v. Crystal B.*, 130 N.M. 336, 24 P.3d 771, 775 (N.M.Ct.App.2000); *cf. A.W.M. v. State*, 627 So.2d 1148, 1151 (Ala.Ct.App. 1993) (where police officers went to school and requested that principal call student to office for questioning, there was sufficient "show of authority" to find a seizure had occurred).

We recognize that students inherently give up some freedoms when they pass through the school doors, and that students are not free to come and go as they please during school hours. However, they still retain some freedom of movement. T.S. may not have had the freedom to roam the school halls when Sergeant Driskell demanded that T.S. leave gym class and accompany him to the locker room. However, we do not think it a stretch to state that T.S. enjoyed greater freedom of movement while in his regular-

---

**10.** "A child commits a delinquent act if, before coming eighteen (18) years of age, the child violates Ind.Code 20–33–2 concerning compulsory school attendance." Ind.Code § 31–37–2–3.

ly-scheduled gym class than while in the company of Sergeant Driskell. Finally, no credible argument can be made that a reasonable student would feel free to disregard an armed officer's demand to leave class. We conclude that the encounter between Sergeant Driskell and T.S. constituted a seizure, and therefore implicated the Fourth Amendment. We now must determine whether this seizure was justified at its inception.

### D.  Justification for the Seizure [11]

Although research has disclosed no Indiana case explicitly applying *T.L.O.* and its progeny to student seizures, the circuits of the United States Court of Appeals seem to be in general agreement that the reasonableness standard of *T.L.O.* applies to school seizures as well as searches. *Gray ex rel. Alexander*, 458 F.3d at 1304 ("we apply the reasonableness standard articulated in *[T.L.O.]* to school seizures by law enforcement officers"); *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141 (3rd Cir.2005) (finding "seizures in the public school context to be governed by the reasonableness standard"); *Wofford v. Evans*, 390 F.3d 318, 327 (4th Cir.2004) ("[A] school official may detain a student if there is a reasonable basis for believing that the pupil has violated the law or a school rule."); *Wallace by Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1014 (7th Cir.1995); *Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1079 (5th Cir.1995), *cert. denied*, 516 U.S. 995, 116 S.Ct. 532, 133 L.Ed.2d 438 (1995); *Edwards ex rel. Edwards v. Rees*, 883 F.2d 882, 884 (10th Cir.1989). In analyzing the first prong of the *T.L.O.* test, whether the seizure was justified at its inception, *Gray ex. rel. Alexander* and *Wofford* both indi-

cate that reasonable suspicion is required. *Edwards* does not explicitly state that reasonable suspicion is required, but its discussion of why the seizure at issue was reasonable implies as much. *See* 883 F.2d at 884 (seizure was justified because statements made to the principal reasonably led principal "to believe that questioning [the student] about the incident might 'turn up evidence that [the student had] violated ... either the law or the rules of the school.'" (quoting *T.L.O.*, 469 U.S. at 342, 105 S.Ct. 733)).

These federal cases dealing with the seizure of a student all are set in the civil context. Our research has also disclosed five state courts that have addressed the applicable standard for student seizures when suppression of evidence is sought in a criminal case.

In *Kline*, the Illinois Court of Appeals addressed a situation virtually identical to the one at issue here. There, a police officer received an anonymous tip that a student was in possession of marijuana. The officer relayed this message to the school's dean, and both the dean and the officer went to the student's class, removed him, and took him to an office, where they questioned and searched the student after obtaining consent. The court first found that the defendant was seized, as the dean and officer's actions constituted "a clear show of authority" over the defendant. 824 N.E.2d at 298. The court next concluded that the "reasonable suspicion" test announced in *T.L.O.* was the proper analysis for seizures carried out in public schools. *Id.* at 300. Finally, the court concluded that, because the anonymous tip contained no indicia of reliability, the dean and officer had no

---

**11.** In its brief, the State relies primarily on arguments relating to searches, and never puts forth an argument that a different standard applies to school seizures than to school searches. However, at oral argument, the State argued that the standard for a seizure should be lower than that for a search.

reasonable suspicion to seize the defendant, and affirmed the trial court's grant of the defendant's motion to suppress. *Id.* at 301–02.

In *Crystal B.,* 130 N.M. 336, 24 P.3d 771, the defendant was walking to school when she stopped to talk with some friends who were smoking cigarettes. Another student had informed the assistant principal that the defendant and others had left school property to smoke. The assistant principal approached the students, who were not standing on school property, ordered them into his car, and took them to his office to search them. A small amount of marijuana was found in the defendant's purse. The New Mexico Court of Appeals looked to the reasonableness of the assistant principal's actions and held that even assuming the assistant principal had the authority to leave school property to investigate a violation of school rules, the seizure of the defendant was unreasonable. *Id.* at 775. The court concluded that because when he approached the defendant, he neither saw anyone smoking, smelled any smoke, nor saw anyone trying to hide anything, any suspicion gleaned from the tip was dispelled. *Id.* Therefore, the seizure and subsequent search were both unreasonable, and the evidence seized should have been suppressed. *Id.*

On the other hand, in *D.E.M.,* a police officer received an anonymous tip that a student possessed a gun on school property. The officer relayed this tip to the principal, who removed the student from class for questioning. After questioning, the defendant admitted to having a gun in the locker of another student. Although the Pennsylvania appellate court analyzed the seizure under a reasonableness standard, the court concluded that the "reasonable suspicion standard is inapplicable to the detention and questioning of a student by school officials." 727 A.2d at 577. The court made this conclusion after "[b]alancing [the defendant's] limited right to control his person while in school, with the need of the school to maintain order and a proper educational environment." *Id.*

The California Supreme Court has also declined to require reasonable suspicion. In *Randy G.,* a security officer had observed the defendant "looking nervous or paranoid and adjusting his pocket upon seeing her." 110 Cal.Rptr.2d 516, 28 P.3d at 242. The officer reported her observations to her supervisor, and she and another security officer proceeded to the defendant's class and removed him to the hallway for questioning. A patdown search of the defendant revealed a knife. The court first rejected the argument that the security officers were required to have reasonable suspicion that the defendant was engaged in wrongdoing, and instead held the relevant inquiry to be "whether the school officials' conduct was arbitrary, capricious, or undertaken for purposes of harassment." *Id.* at 245. *But see, Shuman ex rel. Shertzer,* 422 F.3d at 148 (declining to follow *Randy G.* in light of the other federal courts of appeals' application of *T.L.O.'s* reasonableness test to seizures in public schools, and concluding that "[t]here is simply no Third Circuit or other federal precedent which supports an application of the more lenient 'arbitrary, capricious, or for the purposes of harassment' standard"). The court based its holding upon the logic that the intrusion upon the defendant was "trivial," because "[i]f the school can require the minor's presence on campus during school hours [and] attendance at assigned classes during their scheduled meeting times . . . liberty is scarcely infringed if a school security guard leads the student into the hall to ask questions about a potential rule violation." *Id.* at 246.

Recently, a Florida appellate court addressed a seizure motivated by an anonymous tip and agreed with much of the logic of the California supreme court in holding, "[w]hen school authorities receive information, whether verified or not, involving illegal activities occurring on their campus, calling the suspect student out of class to investigate the report is a reasonable and minimal step in that investigation." *J.D. v. State*, 920 So.2d 117, 122 (Fla.Ct.App. 2006).

Although these cases differ in their determinations of what is "reasonable," all discussed cases, except possibly that of the California Supreme Court, indicated that the fundamental inquiry into school seizures is the two prong test of *T.L.O.*: (1) whether the seizure was justified at its inception, and (2) whether the scope and nature of the seizure was reasonable. T.S. does not articulate an argument that the seizure exceeded its permissible scope, and focuses on arguing that the seizure was not justified at its inception.

■ After analyzing the federal and state court decisions, we conclude that the proper test for determining whether a school police officer was justified in removing a student from his or her class is whether such an intrusion was reasonable. We hold that for such a seizure to be reasonable, an officer does not need the reasonable, articulable suspicion necessary to justify a *Terry* stop of a citizen in public.[12] To clarify, our holding contemplates that a seizure may be unreasonable without being arbitrary, capricious, or undertaken for the purpose of harassment.[13]

■ We base this holding on two principle factors. First, under traditional Fourth Amendment jurisprudence, the State is not required to have as high a level of suspicion to conduct an investigatory stop as it is to conduct a full-fledged search. *E.g.*, *Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (although tip "may have been insufficient for a narcotics arrest or search warrant ... the information carried enough indicia of reliability to justify the officer's forcible stop"). Because under *T.L.O.*, a search in a public school setting is justified upon reasonable suspicion, it follows that some lower standard should be required for an investigatory stop in a public school. Second, students enjoy a lesser expectation of privacy in a public school than they do in public. Because an investigatory stop in public may be justified upon reasonable suspicion, it follows that a lower standard should be required in the public school setting.

Having held that a reasonableness standard applies to seizures in public schools, we now must address whether the anonymous tip in this case can serve to justify Officer Driskell's seizure of T.S.

E. Reasonableness of the Seizure

■ As a preliminary note, when Sergeant Driskell questioned T.S. as to whether he had anything he shouldn't have, Sergeant Driskell had already removed T.S. from gym class and compelled him to accompany him to the locker room. Thus, this situation is distinguishable from a consensual encounter, where we allow police officers to approach citizens and ask similar questions without implicating the Fourth Amendment. *E.g.*, *Overstreet v. State*, 724 N.E.2d 661, 663 (Ind.Ct.App. 2000), *trans. denied*. In these situations, police may ask questions without effecting

---

**12.** We therefore join the Florida and Pennsylvania courts, and disagree with the Illinois appellate court's holding in *Kline*.

**13.** We therefore join the Third Circuit in its disagreement with the California supreme court's holding in *Randy G.*

a seizure "as long as the person to whom the questions are put remains free to disregard the questions and walk away." *Id.* at 664. Although T.S. arguably may have been able to disregard Sergeant Driskell's question, he was not free to walk away at the point Sergeant Driskell posed the question. This case thereby presents a different situation from those cases in which we have allowed police officers to ask these kinds of questions prior to conducting a seizure. *See State v. Lefevers,* 844 N.E.2d 508, 513 (Ind.Ct.App.2006), *trans. denied* (officer can approach driver and ask whether she had been drinking or had made any maneuvers that might lead others to suspect drunk driving without reasonable suspicion because officer has not effected a seizure).

It is undisputed that the only evidence that prompted Sergeant Driskell to remove T.S. from gym class was the anonymous tip. Although we hold that this tip did not need to give Sergeant Driskell the reasonable suspicion normally required to conduct such a seizure, a brief discussion of anonymous tips in the normal Fourth Amendment context is relevant to our determination of whether Sergeant Driskell acted reasonably.

Our supreme court has indicated that in the context of investigatory stops conducted by police officers, an anonymous tip will constitute "reasonable suspicion" only when two conditions are met. First, the State must corroborate significant aspects of the tip. Under this prong, "corroboration requires that an anonymous tip give the police something more than details regarding facts easily obtainable by the general public to verify its credibility." *Sellmer v. State,* 842 N.E.2d 358, 361 (Ind.2006). Second, the tip

"must also demonstrate an intimate familiarity with the suspect's affairs and be able to predict future behavior." *Id.* The rationale of requiring some sort of confirmation is that before interrupting a person's liberty, an officer should have some indication that the tipster is a reliable, good-faith informant, and not a prankster acting in bad-faith. *See Washington v. State,* 740 N.E.2d 1241, 1246 (Ind.Ct.App.2000), *trans. denied.*

The State argues that Sergeant Driskell corroborated significant aspects of the tip because: (1) he confirmed that T.S. was actually at BRHS; and (2) he found marijuana in the location specified by the tipster. Appellee's Br. at 6.

The United States Supreme Court held in *Florida v. J.L.* that "[t]he reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." 529 U.S. 266, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000); *see also Sellmer,* 842 N.E.2d at 362 (holding that although an anonymous tip allowed officers to identify the suspect, the tip "lacked any information that would allow police to corroborate the caller's claim that illegal activity was afoot"). We recently held that an anonymous tip identifying the defendant by name, and indicating that the defendant was manufacturing methamphetamine, growing marijuana, and had a suspended driver's license did not give officers reasonable suspicion to search the defendant's trash.[14] *Richardson v. State,* 848 N.E.2d 1097, 1102–03 (Ind.Ct.App. 2006), *trans. denied.*

The State's argument that the tip's accuracy constitutes confirmation ignores the Fourth Amendment principle

---

14. Our supreme court has held that in order to search an Indiana citizen's trash, officers must have "articulable individualized suspicion, essentially the same as is required for a 'Terry stop' of an automobile." *Litchfield v. State,* 824 N.E.2d 356, 364 (Ind.2005).

that "[t]he reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." *J.L.*, 529 U.S. at 271, 120 S.Ct. 1375; *see also State v. Stickle*, 792 N.E.2d 51, 54 (Ind.Ct.App.2003), *trans. denied.* Indeed, to allow the product of a search or seizure to serve as corroboration of an anonymous tip would be to ignore the fundamental principal that the results of a search or seizure do not justify the initial illegality. *E.g., Bumper v. North Carolina*, 391 U.S. 543, 548 n. 10, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) ("Any idea that a search can be justified by what it turns up was long ago rejected in our constitutional jurisprudence."); *Candler v. State*, 266 Ind. 440, 452, 363 N.E.2d 1233, 1240 (1977) ("a search or seizure cannot be justified by its result").

The anonymous tip in this case clearly did not give Sergeant Driskell reasonable suspicion required to conduct a *Terry* stop outside of a school. Indeed, Sergeant Driskell corroborated no significant aspect of the tip, and the tip itself demonstrated no familiarity with T. S., other than that he did indeed attend BRHS, a fact that could be readily determined by anyone wishing to harass T.S. Indeed, this tip contains the barest indicia of reliability of which we can conceive. Thus, we recognize that all the harms present with anonymous tips are relevant to our analysis of whether Sergeant Driskell acted reasonably.

Neither our supreme court nor the United States Supreme Court has articulated whether an anonymous tip can justify a search initiated by a school official on school property. The United States Supreme Court, after holding that an anonymous tip did not provide the reasonable suspicion necessary to conduct a *Terry* stop at a bus station, stated:

The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability. We do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk. Nor do we hold that public safety officials in quarters where the reasonable expectation of Fourth Amendment privacy is diminished, such as airports, and schools cannot conduct protective searches on the basis of information insufficient to justify searches elsewhere.

*J.L.*, 529 U.S. at 273–74, 120 S.Ct. 1375 (citations and quotations omitted).

■■■ After considering the reduced expectation of privacy that students enjoy in public schools, we hold that Sergeant Driskell acted reasonably in investigating the tip. Removing T.S. from class, although certainly an intrusion on his privacy, was not an invasive intrusion. Indeed, school officials routinely remove students from class for a variety of reasons. Although, as T.S. points out, it may cause more embarrassment for a student to be removed by a police officer, the officers to which this holding applies are also people whom students routinely see in the hallways, and are in the schools not only to enforce laws, but also to maintain a safe environment conducive to learning. As discussed above, the presence of drugs in schools is a serious problem that jeopardizes the learning environment. We think it reasonable that an officer charged with maintaining this environment investigate a tip indicating that a student has drugs on school property by removing the student from class for questioning with the intent

of taking the student to the dean's office.[15] Therefore, the seizure of T.S. did not violate his Fourth Amendment rights.

### III. Indiana Constitution

■ Concluding that the seizure of T.S. did not violate the federal constitution, we now turn to T. S.'s separate argument under the Indiana Constitution. Although the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution are textually indistinguishable,[16] analysis under our constitution is distinct from that under the United States Constitution. *Holder v. State*, 847 N.E.2d 930, 940 (Ind. 2006). "[W]e frequently find Indiana judicial precedent, history or other factors to dictate a different result under the state provision, even where the federal and state constitutions are textually similar or even identical." *Richardson v. State*, 717 N.E.2d 32, 63 (Ind.1999) (Boehm, J., concurring in result).

■ Under Indiana constitutional analysis, we examine whether the State has demonstrated that, under the totality of the circumstances, the search or seizure was reasonable. *Holder*, 847 N.E.2d at 940. We will construe our constitution liberally to ensure individuals' protection from unreasonable invasions of privacy. *Id.* However, we also recognize that the State and citizens share a concern for protection from crime. "Thus, we have observed that the totality of the circumstances requires consideration of both the degree of intrusion into the subject's ordinary activities and the basis upon which

the officer selected the subject of the search or seizure." *Id.* In determining whether an action was reasonable, we generally consider and balance three factors: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Id.*

■ In arguing that this seizure was unreasonable given all the circumstances, T.S. points to the completely anonymous nature of this tip, the "potential for grave humiliation and permanent ostracism" caused by a police officer removing a student from class, and the lack of effort by Sergeant Driskell to corroborate the tip or engage school administrators in the investigation. Appellant's Br. at 21. We recognize that the reliability of the tip in this case is dubious, and that Sergeant Driskell did not possess a high degree of suspicion that a violation had occurred. However, what makes Sergeant Driskell's actions reasonable is not the reliability of the information that caused him to act, but the school setting in which he acted.

Indiana courts have recognized students' reduced right of privacy, and that "[s]tudents generally understand that the preservation of ... a proper educational environment requires close supervision." *Linke v. Nw. Sch. Corp.*, 763 N.E.2d 972, 982 (Ind.2002). Because T.S. already possessed a lesser expectation of privacy, the seizure was not as extensive an intrusion upon his ordinary activities as would have been a seizure occurring in public.

---

**15.** We make no holding as to whether this anonymous tip, without more, would have justified a more intrusive seizure or one of longer duration.

**16.** The Fourth Amendment to the United States Constitution states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. Section 11 in the Indiana Bill of Rights states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated...." Ind. Const. Art. 1, § 11.

We also must remember that "[s]tudents' privacy interests must be balanced with 'the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds,' a task that has become increasingly difficult with the pervasive onslaught of drugs and violent crimes in schools." *Myers*, 839 N.E.2d at 1159 (quoting *T.L.O.*, 469 U.S. at 339, 105 S.Ct. 733). The dual role of school police officers, that of law enforcement and maintaining a safe environment conducive to learning, also weighs in favor of concluding that Sergeant Driskell acted reasonably under the circumstances.

For these reasons, and those discussed in our analysis of T.S.'s federal claim, we conclude that given the totality of the circumstances, most importantly the school setting and Sergeant Driskell's role within the school, Sergeant Driskell's seizure of T.S. was reasonable under the Indiana constitution.

### Conclusion

We hold that Sergeant Driskell acted as a school resource officer in furtherance of educationally related goals, and that therefore, the reasonableness standard of *T.L.O.* applies to his seizure of T.S. We further hold that T.S. was seized within the meaning of the Fourth Amendment, but that this seizure was reasonable. Finally, we hold that the seizure was reasonable under the Indiana Constitution. Because the procedure through which the State obtained the evidence against T.S. complied with both the United States and Indiana constitutions, the trial court properly admitted the evidence.

Affirmed.

BAKER, C.J. and DARDEN, J., concur.